IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Kimberly Frakes | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. ________ |
| | § | |
| Lincoln Life Assurance Company of Boston; | § | |
| | § | |
| Lincoln Financial Group; | § | |
| A.K.A and D.B.A. The Lincoln National Life Insurance Company Disability and Life Claims; | § | |
| SavaSeniorCareAdministrative Services | | |

PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

The Plaintiff, Kimberly Frakes, files this Complaint, and asserts that she was wrongfully denied long term disability by the Defendants, and denied her rights under ERISA under the "Group Disability Income Policy" by: Lincoln Life Assurance Company of Boston (Hereafter referred to as "Lincoln") ; Lincoln Financial Group; A.K.A and D.B.A. The Lincoln National Life Insurance Company Disability andLife Claims; and, SavaSeniorCareAdministrative Services.

SavaSeniorCare Administrative Services, LLC is the "Sponsor" of the Group Disability Income Policy. The Defendant may be served at 8601 Dunwoody Place Suite 775, Sandy Springs, Georgia 30327.

The Defendant Lincoln Life Assurance Company of Boston's Home office, according to the Group Disability Income Policy, hereafter "Disability Policy", is 100 Liberty Way, Ste 100; Dover, New Hampshire 03820-4695 and they refer to this address as the "Administrative Office".

The Disability Plan states that the Disability Policy was signed at Lincoln's Home Office. (FORM ADOP .5) The Group Disability Policy states, "Under no circumstances will the Sponsor be deemed to be the agent of Lincoln." (Form ADOP .5)

**Legal Standards, De Novo and Abuse of Discretion**

The Plaintiff asserts that in the event the case is not considered under the "De novo" standard; that the Plaintiff is disabled under the abuse of discretion standard.

The Disability Policy states that the policy is covered under ERISA and "governing jurisdiction is Georgia." "The Disability plan states that the Disability policy is subject to the laws of the state of Georgia. The Disability Plan states, "Lincoln shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder." (ADOP-GNP-2)

If the administrator has discretion, a court determines whether its benefits discussion was arbitrary and capricious , that is whether it lacked a reasonable basis. Harris v. Lincoln National Life Insurance Co.

The denial of benefits challenged under 29 U.S.C. § 1132(a)(9)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the

terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). "Relevant to our analysis is whether the de novo standard—which applies here—forbids, requires, or simply allows a district court to consider evidence outside the administrative record. As far as we can tell, our sister circuits are divided on the issue" . Harris v. Lincoln Nat'l Life Ins. Co., 42 F.4th 1292, 1295 (11th Cir. 2022)

The term "plan administrator" or "administrator" means the person specifically so designated by the terms of the instrument under which the plan is operated. If an administrator is not so designated, the plan administrator is the plan sponsor, as defined in section 3(16)(B) of ERISA. § 2510.3-16. No plan administrator or administrator is specifically so designated in the Group Disability Policy, and Lincoln Life Assurance Company is not referred to as the "fiduciary." The plan sponsor is SavaSenior Care AdministratorServices, LLC, and they are acting on their own behalf or as the covered persons agent. The Policy does not state whether SavaSenior is acting on their own behalf or as the Plaintiff's agent.

The Plaintiff asserts that because the "administrator" is not designated, and the plan sponsor is SavaSeniorCare Administrative Services LLC, and there is nothing in the policy giving Savasenior Care Administrative Services, LLC discretion, and because SavaSenior does not have discretionary authority to determine eligibility for benefits or to construe the terms of the plan that the Policy is to be considered under a "de novo" standard.

The Plaintiff asserts that in the event the case is not considered under the “De novo” standard that the Plaintiff is disabled under the abuse of discretion standard.

There is no administrator listed in the Disability Policy. The Plan Sponsor is SavaSeniorCar Administrative Services LLC. (FORM ADOP .5)

ERISA 3(16)(A) states: “The term ‘‘administrator’’ means— (i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor . . . . “

According to ERISA 3(16)(A) the Administrator is the plan sponsor, herein SavaSeniorCare Administrative Services, LLC.

The Disability Policy states that “Lincoln shall possess the authority, in its sole discretion, to construe the terms of the policy and to determine benefits eligibility determination.” (ADOP-GNP-2)

Therefore, the denial of benefits under 29 U.S.C. § 1132(a)(9)(B) is to be reviewed under a de novo standard because the benefit plan does not give the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.” Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

“Congress enacted ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). In doing so, it created a "comprehensive and reticulated statute," *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 447, 119 S.Ct. 755,

142 L.Ed.2d 881 (1999) (quotation omitted), designed "to protect contractually defined benefits," *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)." Dwyer v. United Healthcare Ins. Co., 115 F.4th 640, 647 (5th Cir. 2024)

"ERISA furthers these goals by circumscribing how plans can process claims. *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 830, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("Plans must 'provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant.'" (quoting 29 U.S.C. § 1133(1))). The statute additionally requires plans to "'afford a reasonable opportunity ... for a full and fair review' of dispositions adverse to the claimant."" *Id.* at 830-31, 123 S.Ct. 1965 (quoting 29 U.S.C. § 1133(2)).Dwyer v. United Healthcare Ins. Co., 115 F.4th 640, 647 (5th Cir. 2024)

Both inquiries, our review is *de novo,* "regardless of whether the denial is based on factual determinations or interpretation of the plan's language." Dwyer v. United Healthcare Ins. Co., 115 F.4th 640, 647 (5th Cir. 2024) *Miller v. Reliance Standard Life Ins. Co.,* 999 F.3d 280, 283 (5th Cir. 2021).

The Plaintiff sues under ERISA § 503 because the plan administrator failed to comply with the procedural requirements of § 503. The Plaintiff seeks an award of benefits under § 503; or alternatively that court remands the case to an appropriate plan administrator. The Defendant did not state who the Plaintiff may sue, and did not

state who the claims administrator is. In addition, the Plaintiff never received the summary plan, despite repeated requests.

The Plaintiff asserts that the obfuscatory method of the Groups Disability Income Policy, including the failure to name an administrator, asserting that the the ERISA claims is are subject to the laws of the State of Georgia; listing various legal Lincoln entities in the Disability Policy including: Lincoln Life Assurance Company of Boston;; Lincoln Financial Group;; A.K.A and D.B.A. The Lincoln National Life Insurance Company Disability and

Life Claims is a violation of ERISA laws.

The US Department of Labor will determine who is a fiduciary based on whether or not they exercise any authority or control over the Plan's assets. This commonly includes a CEO, CFO or Controller within the organization, even if they are not specifically named in the plan documents. https://www.dol.gov/general/topic/retirement/erisa. There does not appear to be a determination as to who is a fiduciary by the Department of Labor .

The Plaintiff asserts that the denial of benefits should be reviewed under a de novo standard because an administrator is not designated.

On procedure, we ask whether the ERISA fiduciary employed "full and fair review" of the claim as required by law.

The Defendant asserted on August 17, 2023 by letter that “we”, apparently Lincoln Financial Group, is the Claims Administrator. The Policy in the Plaintiff's

possession states RE Long Term Disability (LTD) Benefits; SavaSeniorCare Claim #: 12580825 - Kimberly Frakes, " In *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 830, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003) ("Plans must 'provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant.'" (quoting 29 U.S.C. § 1133(1))). The statute additionally requires plans to "'afford a reasonable opportunity ... for a full and fair review' of dispositions adverse to the claimant." *Id.* at 830-31, 123 S.Ct. 1965 (quoting 29 U.S.C. § 1133(2))."

"In processing those claims, plans have a fiduciary duty to act "in the interest of the participants and beneficiaries." 29 U.S.C. § 1104. That means, as a fiduciary, a plan has a duty of loyalty and a duty of care to plan beneficiarCongress enacted ERISA "to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). In doing so, it created a "comprehensive and reticulated statute," *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 447, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) (quotation omitted), designed "to protect contractually defined benefits," *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)."

"ERISA furthers these goals by circumscribing how plans can process claims. *See* ies. *See Russell,* 473 U.S. at 143 n.10, 105 S.Ct. 3085. Relatedly, ERISA "explicitly authorizes suits against fiduciaries and plan administrators to remedy statutory violations, including breaches of fiduciary duty and lack of compliance with

benefit plans." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (citing 29 U.S.C. § 1132(a), (f))."

Our review under ERISA is two-fold: We look at both substance and procedure. In looking to substance, we ask whether the beneficiary was substantively entitled to the claimed benefits "under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). On procedure, we ask whether the ERISA fiduciary employed "full and fair review" of the claim as required by law. *Id.* § 1133(2). Interpretation of the Policy Lincoln shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Lincoln's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." (P. 78 of policy)

An ERISA claimant bears the burden to show that the administrator abused its discretion. See Anderson v. Cytec Indus., Inc., 619 F .3d 505, 512–13 (5th Cir. 2010). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." Holland, 576 F.3d at 246 (internal quotation marks omitted). Similarly, a decision constitutes an abuse of discretion "only if it is 'made without a rational connection between the known facts and the decision or between the found facts and the decision.' " Truitt v. Unum Life Ins. Co. of Am., 729 F.3d 497, 508 (5th Cir.2013) (quoting Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d 211, 215 (5th Cir.1999)).

The Plaintiff, therefore, alternatively asserts that if the court does not apply the de novo standard, that the facts of the case establish that there was an abuse of

discretion by the administrator in denying the Plaintiff's claim. Specifically, the Plaintiff asserts that whoever the plan administrator is aced in an arbitrary and capricious manner. See, Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111-115 (1989).

**Summary of ERISA violations**

The Plaintiff, Mrs. Frakes, sued under ERISA § 502(a)(1)(B) for denial of long term disability benefits. The Plaintiff properly made a claim for benefits; The Plaintiff was granted disability benefits for 24 months as the decision was made she was disabled from her former occupation as an occupational therapist; The Plaintiff exhausted the Disability Income Policy's administrative appeal process; The Plaintiff was entitled to long term disability benefits as she was disabled under the Disability Policy in part because she could not sit long enough to perform a sedentary occupation; a Federal Administrative Social Security Law Judge made the decision that the claimant could not perform sedentary work and, Lincoln partnered with Brown & Brown who apparently argued before the Social Security Administration that Mrs. Frakes was disabled due to her inability to sit six hours out of an eight hour day, or failed to appeal the Federal Administrative Judges Decision; The Federal Administrative Judges "Fully Favorable" decision is dispositive that the Plaintiff is disabled because it is the decision of a Federal Administrative Law Judge, who was represented by a a partner of Lincoln, Brown & Brown; and, Lincoln was to decide the Plaintiff's Eligibility for Long Term Disability; The plaintiff was not offered nor given a rehabilitation program, nor was one recommended by Lincoln, while she was receiving short term disability thereby acknowledging that the Plaintiff was not suitable for rehabilitation for any

occupation; "Rehabilitation Program means a comprehensive individually tailored, goal oriented program to return a Disabled Covered person to gainful employment." (FORM ADOP-STD-6); The legal standard of "continuity" was not used in deciding the occupations the Plaintiff could perform.

The Plaintiff was denied a full and fair review, as required by law, for the following reasons: 1) The Defendants basically added provision on the Group Disability Income Plan that changed the definition of Material and Substantial Duties of any occupation to to a definition that stated that included: "technological advancement, employers are providing a variety of workstation types and associated equipment that would allow an individual opportunity to experience and sustain comfort in their respective work settings within the occupations above." Thereby, Lincoln states that any job can be modified for a disabled claimant to perform; The Defendants changed the record after one or more decisions, hiring experts etc. to justify the reasons for their previous denials; The Defendants extended the time to review the appeals without stating good reason, as is necessitated by ERISA laws; The Defendants did not consider the responses to the questionnaire they provided to the Plaintiff as to her impairments or disabilities, did not forward the document to their experts to evaluate for, or credibility.

The Social Security Disability Decision found that the Plaintiff could not perform sedentary work, and was disabled from any occupation, while the Plaintiff was being represented by the business partner for Lincoln, Brown and Brown.

The Defendant Lincoln was partners with the company of Brown and Brown who represented the plaintiff for Social Security Disability; Brown and Brown acted as an agent for Lincoln; Lincoln referred the Plaintiff to her; and the firm asserted that the Plaintiff could not perform sedentary work because of her inability to sit.

A partnership in Texas is defined under the Business Organization Code, Title 4, Chapter 152. BUSINESS ORGANIZATIONS CODE. Section 152 052 defines partnership in Texas.

There are codified partnership laws in Georgia as well. "Except as otherwise provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the rights and powers and is subject to the restrictions of and liabilities to the partnership and to the other partners of a partner in a partnership without limited partners." GA Code § 14-9-403 (2022)

The partners of Lincoln and Brown and Brown, cannot assert one thing in an ERISA denial that the claimant can sit eight hours in a day ; and another thing before, the Social Security Administration, that the claimant has only the ability to sit four hours in an eight hour day. Mrs. Frakes has no information nor belief that the favorable Social Security Decision was appealed by Brown & Brown. **See Exhibit A**, Notice of Decision - Fully Favorable dated March 25, 2025, for a hearing held on February 25, 2025, and a retroactive decision to September 7, 2021.

There is a de novo standard of Appeal in the 11th Circuit Court of Appeals; as the administrator does not have discretionary authority to determine eligibility for benefits.

Under a *de novo* standard of review, the court is not limited to the claim file. Harris v. Lincoln National Life Insurance Company 2022 U.S. App. LEXIS 21049, 2022 WL 3009199 (11th Cir. July 29 2022)

In the *Harris* case, "Virgil Harris brought suit against Lincoln for the denial of his disability benefits. Both parties agreed that the Plan documents did not grant discretionary authority to Lincoln and therefore, the court would review the case under the *de novo* standard of review." Harris v. Lincoln National Life Insurance Company 2022 U.S. App. LEXIS 21049, 2022 WL 3009199 (11th Cir. July 29 2022)

The Eleventh Circuit ruled, that based on their prior decisions the parties can introduce evidence outside of the claim file; that is the Plaintiff has an opportunity to bring in new evidence that is not found in the claim file."

"The district court erred by not considering Mr. Harris' post-denial evidence, and Lincoln does not assert that this error was harmless. See 28 U.S.C. § 2111; Fed. R. Civ. P. 61." Therefore, under the laws of the state of Georgia, the case at bar is reviewed de novo; and, Mrs. Frakes is entitled to submit post-denial evidence. In addition, Mrs. Frakes is entitled to introduce the evidence because her case was referred to a partner of Lincoln, Brown & Brown; and, Brown & Brown either argued for the limitations of less than sedentary work due to sitting limitations, which is contrary to the position of their partner Lincoln; or Brown and Brown did not appeal the favorable decision by the Federal Administrative Social Security Law Judge which limited the Plaintiff Mrs. Frakes to less than sedentary work due to her inability to sit and walk.

Under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B), a plan administrator's benefits decision is subject to plenary review in federal court unless the administrator is given discretion to determine eligibility or construe the terms of the plan. See Aetna Health, Inc. v. Davila, 542 U.S. 200, 210, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004); Gilley v. Monsanto Co., Inc., 490 F.3d 848, 856 (11th Cir. 2007). If the administrator has discretion, a court determines whether its benefits decision was arbitrary and capricious (i.e., whether it lacked a reasonable basis). See, e.g., Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008).[1]

In the Harris E. case, everyone agreed that Lincoln's denial of long-term disability benefits to Virgil Harris triggered de novo review because the plan did not give Lincoln discretion. The district court, acknowledging that its review of the denial was plenary, ruled that Mr. Harris could not submit evidence that had not been presented to Lincoln before it denied benefits in August of 2019. As a result, when the court granted Lincoln's motion for judgment on the administrative record, it did not consider an affidavit and updated medical records which post-dated the denial of benefits.

The Plaintiff sues under ERISA § 503 because the plan administrator failed to comply with the procedural requirements of § 503. The Plaintiff seeks an award of benefits under § 503; or alternatively that court remands the case to an appropriate plan administrator. The Defendant did not state who the Plaintiff may sue, and did not

state who the claims administrator is. In addition, the Plaintiff never received the summary plan, despite repeated requests.

The Plaintiff asserts that the obfuscatory method of the Groups Disability Income Policy, including the failure to name an administrator, asserting that the the ERISA claims is are subject to the laws of the State of Georgia; listing various legal Lincoln entities in the Disability Policy including: Lincoln Life Assurance Company of Boston;; Lincoln Financial Group;; A.K.A and D.B.A. The Lincoln National Life Insurance Company Disability and

Life Claims is a violation of ERISA laws.

The US Department of Labor will determine who is a fiduciary based on whether or not they exercise any authority or control over the Plan's assets. This commonly includes a CEO, CFO or Controller within the organization, even if they are not specifically named in the plan documents. https://www.dol.gov/general/topic/retirement/erisa. There does not appear to be a determination as to who is a fiduciary by the Department of Labor .

The Plaintiff asserts that the denial of benefits should be reviewed under a de novo standard because an administrator is not designated.

On procedure, we ask whether the ERISA fiduciary employed "full and fair review" of the claim as required by law.

The Defendant asserted on August 17, 2023 by letter that "we", apparently Lincoln Financial Group, is the Claims Administrator. However, the Administrator is not

stated in the Group Disability Income Policy and Lincoln has refused to provide the summary plan to the Plaintiff.

An ERISA claimant bears the burden to show that the administrator abused its discretion. See Anderson v. Cytec Indus., Inc., 619 F .3d 505, 512–13 (5th Cir. 2010). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." Holland, 576 F.3d at 246 (internal quotation marks omitted). Similarly, a decision constitutes an abuse of discretion "only if it is 'made without a rational connection between the known facts and the decision or between the found facts and the decision.' " Truitt v. Unum Life Ins. Co. of Am., 729 F.3d 497, 508 (5th Cir.2013) (quoting Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d 211, 215 (5th Cir.1999)).

The Plaintiff, therefore, alternatively asserts that if the court does not apply the de novo standard, that the facts of the case establish that there was an abuse of discretion by the administrator in denying the Plaintiff's claim. Specifically, the Plaintiff asserts that whoever the plan administrator acted in an arbitrary and capricious manner. See, Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111-115 (1989)

The Plaintiff asserts that an abuse of discretion occurred, and that the undesignated "plan administrator" because : 1) The Defendant added a new standard to the policy, stating that there can be modifications; 2) The Defendant requested additional time to make their decisions without adequate cause; 3) The Defendant retained experts after their denial decisions to justify their prior denial, such as to

challenge the plaintiffs previous assertions that she could not perform sedentary work because she could not sit an adequate amount of time; 4) The Plaintiff failed to consider or to provide them to their medical specialists the Plaintiff's statements regarding her physical residual functional capacity, including the statement that they elicited in a questionnaire,

When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). For plans that do not have valid delegation clauses, the Supreme Court has held that “a denial of benefits’. For plans that do not have valid delegation clauses, the Supreme Court has held that “a denial of benefits is to be reviewed under a de novo standard.” Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)

The Employee Retirement Income Security Act of 1974's (“ERISA”) text “does not directly resolve” the question of the appropriate standard of review of an ERISA plan administrator's decision to deny plan benefits. Conkright v. Frommert, 559 U.S. 506, 512 (2010). In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Supreme Court held that “[c]onsistent with established principles of trust law, a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.” Id. at 115. Accordingly, where an ERISA plan delegates discretionary authority to the plan administrator (a “discretionary clause”) courts review the plan administrator's decisions for abuse of discretion. See, e.g.,

Barhan v. Ry-Ron Inc., 121 F.3d 198, 201 (5th Cir. 1997); Ariana v. Humana Health Plan of Texas Incorporated, No. 16-20174, Par. II, (5th Cir. 2017)

When an ERISA plan lawfully delegates discretionary authority to the plan administrator, a court reviewing the denial of a claim is limited to assessing whether the administrator abused that discretion. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989) For plans that do not have valid delegation clauses, the Supreme Court has held that “a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard.” Id. For a quarter century, we have interpreted that holding to apply only to a denial of benefits based on an interpretation of plan language. The result is a bifurcated standard of review for challenges in our circuit to the denial of ERISA benefits. Ariana v. Humana Health Plan of Texas Incorporated, No. 16-20174, Par. II, (5th Cir. 2017)

The Plaintiff was found to be disabled for the first 24 months for long term disability was approved by letter dated April 12, 2022, as she was deemed to be unable to perform the duties of her occupation. (693-695)

The correspondence between the Plaintiff and persons representing themselves as responsible for denial of this case is from “Lincoln Financial Group” and “the Lincoln National Life Insurance Company Disability and Life Claims” There is no correspondence between the Plaintiff and “Lincoln Life Assurance Company of Boston” , that the Plaintiff could locate. .

The Plaintiff asserts that the following constitutes a wrongful denial of the Plaintiff’s Long Term Disability Benefits under the Disability Policy:

1. The Physician which she was referred to by the Defendants Lincoln Life Assurance Company of Boston, or SavaSeniorCare Administrative Services, LLC stated she could not work;

2. The Plaintiff could not perform her former job which was medium, according to Lincoln Financial Group, and therefore she could not perform any medium occupation;

3. The Plaintiff was not suitable for rehabilitation for her own occupation, a medium occupation as dictated by the Defendant Lincoln, and therefore was unemployable; because if she could not be rehabilitated for a medium occupation she could not be employable for a sedentary position;

4. The Defendants did not specify nor place any workplace modifications, and therefore none were suitable for her to perform her former sedentary job; (54)

5. When the Plaintiff appealed the denials of her long term disability claim, the Defendant merely engaged in the retroactive retention of experts and production of expert reports, to attempt to justify their abuse of discretion at the previous denial. Therefore, admitting that their prior decision could not be supported by the record and was an abuse of discretion.

6. There was a mandatory requirement for the Plaintiff Frakes to apply for social security disability in order to apply for disability through Lincoln, Lincoln was partners with Brown & Brown to establish Mrs. Frakes was disabled from any job which existed in the National Economy under social security regulations; and she was found to be disabled retroactively. See, letter from Lincoln Financial group darted June 27, 2023

which requires the Plaintiff to appeal; an attachment to Brown and Brown SSDI FAQ attachment.

**Summary of the Claim file provided to the Plaintiff**

The Claim file which was provided to the Plaintiff did not include any letters from Plaintiff's undersigned counsel. Some page numbers are included in parentheses, and the claim file provided to the Plaintiff totalled 708 pages.

5/06/24 Addendum from Dr. George Kum Nji stating the plaintiff experienced chronic pain while sitting due to the battery placement of neurostimulator; mild multilevel disc height loss which is most prominent at L3-4 and L4-5 with mild spurring at these levels; mild to moderate facet sclerosis at L4-5 and L5-S1. (99) She reports she has to sit leaning entirely to the left due to current position of neurostimulator. was suffering chronic pain to her left rib and hip region while sitting and standing, secondary to the battery placement of her neurostimulator. (99-100) She is not currently physically or mentally able to return to any type of work duties employment. (100)

April 25, 2024 MRI from Lonestar Urgent Care states: states Mild multilevel disc height loss which is most prominent at L3-4 and L4-5 and mild to moderate facet sclerosis at L4-5 and L5-S1 bilaterally. (99)

April 22, 2024 from Plaintiff Kimberly Lynn Frakes two page letter dated stating: "I am suffering chronic pain to my left rib and hip region while sitting and standing, secondary to the battery placement of my neurostumulator." "My gait while sitting and standing is very poor due to the pain I am having." "My shoulder has begun to lock up again, medically referred to as frozen shoulder."

?/15/2024 medical report from Arthritis & Osteoporosis Center of Coastal Bend Advance Rheumatology states in part: “Patient reports she has to sit leaning entirely to the left due to the current position of neuromodulator . . .”

LoneStar Urgent Care MRI dated April 25, 2024 states multilevel disc height is most prominent at L3-4 and L4-5 with mild spurring at these levels and mild to moderate facet sclerosis at L4-5 and L5-S1 bilaterally.

Lincoln Financial Group letter to Kimberly Frakes dated April 10, 2024 states enclosed is a copy of the clinical reviews completed on March 14, 2024 by a Nurse Disability Appeals Consultant and on March 28, 2024 by an independent physician Board Certified Disability Appeals consultant and a Vocational Assessment t adapted April 8, 2024.

March 14, 2024 “Appeal Nursing Memorandum” signed by Sharon H. RN, Summarizes Medicare records through February 2024. “On February 15, 2024, the employee was seen for a functional capacity evaluation. Evaluation notes that the qualifies under sedentary work but verbalized inability to tolerate 8 hours of work rather able to tolerate maximum of 1 hour with light duty. Accommodations included avoiding prolonged sit and stand, driving, walking, walking on uneven surfaces, squatting, kneeling, climbing stairs and ladders, lift/carry more than 3 pounds, frequent breaks every 5-10 minutes.” “(I)t is unclear if the restrictions as outlined in the functional capacity evaluation are reasonable and supported. Therefore, to evaluate the employees physical condition and any restrictions and limitations ongoing, recommend a full file review with physical medicine and rehab. (187- 192)

“The employee separated from the workplace on September 7, 2021. On September 7, 2021, urgent care providers endorsed restrictions after the employee was seen on this day. Per this letter the employee was unable to work due to worsening right foot neuropathy ( pain due to nerve damage) causing unsteady gait and falls, she was unable to lift, push, pull or twist, was referred to orthopaedic for further evaluation. On September 13, 2021, the employee was seen by Dr. Robert Williams, orthopaedics, for evaluation of right foot pain and toes. The employee had undergone removal of a right arch fibroma (mass) on April 21, 2021, performed by Dr. Larkins. She has been released by this provider. She is having severe right foot pain and difficulty with weight bearing. She notes she had a similar procedure on the left with good result On exam she had mild bruising and swelling in the foot, tenderness in the incision sight Neurovascular exam of the lower extremity was normal. Clinical presentation is consistent with complex regional pain syndrome (type of chronic pain that develops after an injury). M RI of the right foot on September 22, 2021, showed thickening along the surgical site compatible with postsurgical changes. Tendon tear noted and chronic rupture of the ligaments in the hindfoot noted. On October 4, 2021, the employee was referred to an orthopaedic surgeon for evaluation. Dr. Williams completed an attending physician's statement on October 15, 2021, endorsing restrictions pending appointment with orthopedic surgeon. On December 16, 2021, the employee was seen by Dr. Mark Casillas, orthopaedic surgeon, for evaluation of right plantar (bottom) foot pain. Per this note the employee had ankle reconstruction done for an ankle fracture in the past She is unable to weight bear without falling. On exam she had moderate swelling in the right

foot with tenderness, limited motion in the toes with pain, positive Tinel's sign at the tarsal tunnel (suggestive of nerve damage in the inside of the ankle), normal motion in the ankle. Diagnosis of complex regional pain syndrome type 1 of the right lower extremity. Recommended physical therapy to treat for pain desensitization.

On January 6, 2022, the employee underwent an MRI of the left shoulder due to pain. Tendinosis noted (degeneration of the tendon). An MRI of the lumbar spine was also performed due to back pain. There was evidence of disc protrusion/herniation on the S1 nerve root bilaterally, impingement on thecal sac (covering of the spinal cord) at additional levels of the lumbar spine.

On February 3, 2022, Dr. Casillas provided an out of work note thru March 1, 2022, noting the employee has been referred to another physician. The employee was seen this day and was referred for tendon sheath injection in the right tarsal tunnel.

On February 8, 2022, the employee was seen by Dr. Raul Martinez, pain medicine, for her foot pain. On exam she had decreased plantar flexion in the right ankle with hyperesthesia (sensitivity to touch) allodynia (pain due to a stimulus that does not normally provoke pain) skin discoloration to the right foot region with swelling and decreased motion and motor function to the foot. She also had decreased toe extension and flexion. Diagnosis of complex regional pain syndrome of lower limb and right foot pain. The employee has tried therapy and neuropathic pain medications with no relief. Additional therapy recommended, discussed advanced pain therapy including spinal cord stimulator and sympathetic nerve blocks (injections around nerve roots for chronic pain). She was endorsed out of work and was to undergo right lumbar

sympathetic blocks to try to break the pain cycle. The employee is overweight and was counseled on weight loss.

On February 23, 2022, the employee underwent her first lumbar sympathetic block. Her second procedure was completed on March 10, 2022. Third lumbar sympathetic block was performed on April 1, 2022.

On April 27, 2022, the employee returned to pain management and was seen by Molly Trevino, nurse practitioner. She reported 40 % relief with the most recent block. X-rays ordered; she was started on the Cymbalta trial (anti-depressant that also provides pain relief).

On June 22, 2022, the employee returned to pain management and was seen by Dr. Matthew Hoch. She presented with foot and low back pain on the left side. Cymbalta did not help alleviate her pain. She had no change to the right lower extremity examination. Updated imaging of the lumbar and thoracic spine ordered as well as psychological evaluation for consideration of spinal cord stimulator therapy.

MRI of the thoracic spine on July 25, 2022, showed mild degenerative disc disease with mild spondylosis and facet arthropathy (degenerative disease). No disc herniation of foraminal stenosis seen.On July 28, 2022, the employee returned to pain management and was seen by Dr. Hoch for low back pain. She was seen for the implantation of an epidural spinal cord stimulator trial (implanted device that sends signals to the spinal cord to relieve pain).

On August 4, 2022, the employee returned to Dr. Hoch for her low back pain and right foot pain. She reported swelling to the foot has reduced and she is able to stand

longer, going up and down stairs is less painful. Numbness has decreased. Able to perform most activities of daily living with pain. 70 % improvement in pain noted. Given the successful trial, she was referred to a surgical specialist for permanent implantation.

On January 23, 2023, the employee was seen by Dr. Ian McDougall, neurosurgery. Per this report the employee was seen about 4 months ago with infection around the spinal cord stimulator site from another surgeon. Infection was cleared with IV antibiotics. She presents for consideration of re-implantation. Procedure to be scheduled in 4-6 weeks pending insurance authorization.

On June 8, 2023, the employee returned to Dr. Hoch for low back pain that radiates to the right leg as well as foot pain. A second spinal cord stimulator implant was placed in March 2023. Provides about 40% relief of pain. She reports sharp pain in her head when she uses the stimulator. On exam she had pain with range of motion of the right foot. She was started on hydrocodone for severe pain. Spinal cord stimulator device was reprogrammed to help improve pain coverage of toes.

On June 15, 2023, the employee was seen in urgent care due to left shoulder joint pain. X-ray of the left shoulder showed no acute fracture or malalignment. She had mild osteoarthritis.

On July 10, 2023, the employee was seen by Dr. Williams for left shoulder pain and loss of function. She notes falls several times due to her complex regional pain syndrome in the right lower extremity. On exam she had diminished range of motion, weakness and positive impingement signs.

MRI of the left shoulder was done on July 25, 2023, showed thickening of ligaments with edema that correlate with signs of adhesive capsulitis (causes shoulder stiffness) mild tendinosis without rotator cuff tear and tearing of the labrum (in the shoulder).

On August 1, 2023, the employee returned to Dr. Williams. She was given an injection into the shoulder which resulted in some improvement in motion but still diminished. She had weakness and positive impingement signs. She was referred for a course of physical therapy for 4 weeks.

On August 3, 2023, the employee returned to Dr. Hoch for pain management follow up of shoulder pain and foot pain. She was stable on hydrocodone. Injections in the shoulder provided no relief, she requested an increase in medication. She had diminished motion in the left shoulder. She was doing well with the spinal cord stimulator and hydrocodone that keeps the pain tolerable. She was to increase hydrocodone if needed for shoulder pain during fairly aggressive physical therapy.On August 7, 2023, the employee underwent physical therapy initial evaluation for her left shoulder. She attended physical therapy on August 9, 10, 14, 16, 18, 21 and 22, 2023.

On August 29, 2023, the employee had a progress report completed from physical therapy. Pain persists in the left shoulder with inability to lift the left arm past 35 degrees of flexion, 25 degrees of abduction. She has had minimal improvement and is ready to have more testing from orthopaedics. For this reason, she was discharged from formal therapy.

On September 6, 2023, the employee returned to orthopaedics and was seen by Kimberly Petrila, physician's assistant for left shoulder pain and loss of function. She continued to show weakness and positive impingement signs in the left shoulder with diminished motion and significant guarding. Injection provided into the left shoulder. Provider opines that the employee has full external rotation which is unusual for adhesive capsulitis. She also notes motion overhead triggers her spinal cord stimulator and shocks her. She was referred back to another course of physical therapy.

On September 7, 2023, the employee was seen by Dr. Ian McDougall, neurosurgeon, for malposition of her spinal cord stimulator generator; it likely migrated due to 40 pound weight loss. Discussed surgery to revise site position as she bangs it more often and sits on it.

On September 11, 2023, the employee returned for evaluation with physical therapy to resume therapy for her left shoulder adhesive capsulitis. Plan was for 3 times a week for 3 weeks. She attended physical therapy on September 12, 14, 18, 19, 21, 25 and 26, 2023.

On September 27, 2023, a progress report from physical therapy notes very little improvement with therapy. She reports increase in pain in the left shoulder and all over pain in her joints. She was awaiting surgery to reposition the stimulator. She was discharged from physical therapy due to pending surgery and little to no improvement.

On October 3, 2023, the employee returned to Dr. Williams for her left shoulder pain. She reported no improvement in symptoms with physical therapy. Discussed possibility of shoulder surgery.

Per an after visit summary, the employee was seen by neurosurgery on October 13, 2023.

On October 13, 2023, a peer review from a physical medicine and rehab perspective was completed. Please see report for complete information.

On October 19, 2023, the employee returned to Dr. McDougall for postop visit after her spinal cord stimulator generator site was repositioned. She reports significant discomfort as the generator contacts her lateral ribs. There were no signs of infection noted, she was given a steroid dose pack for any potential inflammation and refilled pain medication.

On October 30, 2023, the employee returned to Dr. Williams for orthopaedic follow up of left shoulder pain. Dr. Hoch was contacted who advised the employee was not a good candidate for shoulder surgery due to her history of complex regional pain syndrome. She was to see Dr. Hoch and consider further pain management intervention.

On December 12, 2023, the employee returned to Dr. Williams. She continues to show diminished motion in the shoulder, weakness and positive impingement signs. The employee was considering manipulation under anesthesia for her shoulder (procedure to break up excessive scar tissue in the shoulder joint).

On January 5, 2024, the employee returned to orthopaedics and was seen by PA Petrila. She was scheduled for the manipulation under anesthesia procedure and was being seen for pre-op clearance. Provider notes she has failed extensive conservative treatment for her left shoulder pain, has constant pain and dysfunction in the left

shoulder. Discussed she was at high risk for chronic pain given her history of complex regional pain syndrome, she voiced understanding. She stated she has resigned herself to living with chronic pain and has been told it will worsen.

On January 10, 2024, the employee underwent a manipulation under anesthesia of the left shoulder with injection into the left shoulder performed by Dr. Williams.

On January 29, 2024, the employee returned to orthopaedics and was seen by PA Petrila. She reports ongoing shoulder pain and popping. No physical therapy yet due to lack of availability, first session scheduled for February 6, 2024. She is still under treatment with pain management. She had limited motion in the shoulder.

The employee was also seen in urgent care on January 29, 2024, due to complaints of lung pain. Provider opines that her complex regional pain syndrome has evolved to causing pain in her lungs. Recommended a rheumatology evaluation and functional capacity evaluation.

On February 15, 2024, the employee was seen for a functional capacity evaluation. Evaluation notes that the qualifies under sedentary work but verbalized inability to tolerate 8 hours of work, rather able to tolerate maximum of 1 hour with light duty. Accommodations included avoiding prolonged sit and stand, driving, walking, walking on uneven surfaces, squatting, kneeling, climbing stairs and ladders, lift/carry more than 3 pounds, frequent breaks every 5-10 minutes.

On February 20, 2024, the employee provided a letter in response to denial of her long term disability. Letter reviewed in its entirety which outlines her clinical history.

She is awaiting rheumatology evaluation, also notes recent functional capacity evaluation.

On February 28, 2024, a letter from Jace Cain, nurse practitioner, urgent care, notes the employee has been a patient since 2022, she has complex regional pain syndrome that significantly impacts her ability to perform voluntary and functional activities.

Jane Cain, nurse practitioner states: In summary, the employee initially separated from the workplace in September 2021, due to the development of complex regional pain syndrome in her right foot after surgery performed in April 2021. The employee had tried physical therapy and neuropathic pain medications without relief. She underwent lumbar sympathetic blocks and eventually underwent a spinal cord stimulator placement. Pain was managed with this and hydrocodone. In June 2023, the employee had ongoing left shoulder pain and loss of function. She was diagnosed with shoulder impingement and referred for course of physical therapy in August 2023. There was minimal improvement in the shoulder, and she eventually underwent manipulation under anesthesia of the left shoulder in January 2024. The employee also required repositioning of the spinal cord stimulator generator that had moved from the initial placement. She is pending a rheumatology evaluation as of February 2024. A functional capacity evaluation was performed on February 15, 2024, from which NP Cain had indicated her conditions significantly impacts her ability to perform voluntary and functional activities.

Jane Cain, nurse practitioner states: based on the available medical evidence, it is unclear if the restrictions as outlined in the functional capacity evaluation are reasonable and supported. Therefore, to evaluate the employee's physical condition and any restrictions and limitations ongoing, recommend a full file review with physical medicine and rehab.

Jane Cain, nurse practitioner states, advised claim resolution consultant case review is completed, no further activity is required. Sharon H., RN, BSN, CCM (187-192)

March 8, 2024 letter from The Lincoln financial Group's Nakeshia Killian to the Plaintiff:

Lincoln National Life Insurance Company (Lincoln) is responsible for managing claims for Long Term Disability (LTD) benefits under SavaSeniorCare's Group Disability LTD Policy. We are writing regarding your claim for LTD benefits under the Policy.

We received your request for review of the recent claim determination on your LTD claim on 3/8/2024.

We understand this is all of the information you intend to submit for our consideration of your LTD appeal. Consequently, your file has been forwarded to Lincoln's Claims Resolution Services for a full, and fair review.

If you have any questions regarding the status of your appeal, you may also reach me via my contact information listed below or via email to DisabilityDocuments@lfg.com. Please be sure to include your claim number in any submissions.

To assist us in evaluating your eligibility for benefits we have referred your file for a medical review and assessment by a Board Certified Registered Nurse. We anticipate a response from the reviewing Board Certified Registered Nurse in approximately 30 days. If there is an unexpected delay in receiving a response, we will contact you. Otherwise, we will proceed with our review of your appeal once the response is received. We regret any inconveniences this delay may cause; however, the assessment is necessary to ensure a thorough review of your eligibility for benefits under the terms of the Policy.

In accordance with the Employee Retirement Income Security Act, under normal circumstances, you will be notified in writing of a final decision within 45 days from the date your request for review was received, excluding any days in which we are waiting for you to submit documentation. We will contact you if there are special circumstances requiring a delay in Lincoln's response, and you will be notified of our decision no later than 90 days after the request for review was received. (194-195)

March 8, 2024 letter to Plaintiff from Nakeshia Killian, Claims Resolution Specialist: Lincoln National Life Insurance Company (Lincoln) is responsible for managing claims for Long Term Disability (LTD) benefits under SavaSeniorCare's Group Disability LTD Policy. We are writing regarding your claim for LTD benefits under the Policy.

We received your request for review of the recent claim determination on your LTD claim on 3/8/2024. We understand this is all of the information you intend to submit

for our consideration of your LTD appeal. Consequently, your file has been forwarded to Lincoln's Claims Resolution Services for a full, and fair review.

If you have any questions regarding the status of your appeal, you may also reach me via my contact information listed below or via email to DisabilityDocuments@lfg.com. Please be sure to include your claim number in any submissions.

To assist us in evaluating your eligibility for benefits we have referred your file for a medical review and assessment by a Board Certified Registered Nurse. We anticipate a response from the reviewing Board Certified Registered Nurse in approximately 30 days. If there is an unexpected delay in receiving a response, we will contact you. Otherwise, we will proceed with our review of your appeal once the response is received. We regret any inconveniences this delay may cause; however, the assessment is necessary to ensure a thorough review of your eligibility for benefits under the terms of the Policy.

In accordance with the Employee Retirement Income Security Act, under normal circumstances, you will be notified in writing of a final decision within 45 days from the date your request for review was received, excluding any days in which we are waiting for you to submit documentation. We will contact you if there are special circumstances requiring a delay in Lincoln's response, and you will be notified of our decision no later than 90 days after the request for review was received. (198-199)

On June 22, 2022, the employee returned to pain management and was seen by Dr. Matthew Hoch. She presented with foot and low back pain on the left side. Cymbalta

did not help alleviate her pain. She had no change to right lower extremity examination. Updated imaging of the lumbar and thoracic spine ordered as well as psychological evaluation for consideration of spinal cord stimulator therapy.

February 20, 2024 letter from Kmberly Frakes to respond to discontinuation of long term disability and to appeal.

The Plaintiff Kimberly Frakes made their decision based upon a Nurse Practitioner who saw her less than 10 minutes and phone conversation after a follow-up. She had an emergency visit with Dr. McDougal secondary to the severe pain the battery placement was/and still is causing by rubbing on my ribs and hip with sitting and movement." She has a neurostimulator implant with numerous revisions which causes pain when sitting due to rubbing. The pain is alleviated lying down on her stomach.

Her PCP ordered a functional capacity evaluation which was performed on 2/15/24 at Humpal Physical Therapy with Sedentary work and frequent breaks every 5 to 10 minutes.

LonStar Urgent Care record dated 02/28/24 states she is rated as sedentary; the condition lasted greater than 12 months and is chronic; and meets with requirement of disability under the Americans with Disabilities Act. Signed by Jace Cain FNP-C.

Functional Capacity Evaluation Summary Initial by Humpal Physical Therapy: Occupations: COTA, DOT COde 076.364-010. Qualifies as Sedentary; inability to tolerate 8 hours of work; avoid prolonged sitting breaks every 5 to 10 minutes. Signed by Phillip J. Cronkite Jr., PT.

Surgery notes by Robert S. Williams M,.D.. Date of Surgery 01/10/24. Postoperatiovediagnosis left shoulder adhesive capsulitis, left shoulder impingement syndrome.

Radiology Ass., LLP Exam signed on 07/25/2023 with impression of thickening of the inferior glenohumeral ligament, with poriligamentous edema; Mild Supraspinatus and infraspinatus tendinosis; tearing of the posterior superior labrum.

Coastal Orthopedic Records dated 07/10/2023. Left shoulder pain. Assessment of Impingement syndrome of left shoulder; adhesive capsulitis of left shoulder. Signed by Rober S. Williams M.D.

Radiology Ass., LLP records signed by Bryan Hanus, MD. on 07/25/23. Impression Thickening of the inferior glenohumeral ligament, with peroligamentous edema; Mild Supraspinatus and infraspinatus tendinosis, without rotator cuff tear; tearing of the posterior superior labrum.

Coastal Orthopedics records dated 08/01/23. Left shoulder pain and loss of functionBack Stimulator implant. Clinically she has adhesive/capsulitis/impingement. Left shoulder subacromial space injection. Ordered physical therapy 2 to 3 times a week for 4 weeks. Provider Robert Williams M.D.

Coastal Orthopedics records dated 00/02/2023. Ordered physical therapy 3 times a week for 3 weeks. signed by Kimberly A. Petrila PA C on 09/06/2023.

Coastal Orthopedics records dated 09/06/2023. Under treatment of Dr. Matthew Hoch Texas pain Management. She may be a candidate arthroscopic adhesiolysis,

subacromial decompression and manipulation anesthesia. Robert S.Willimas, mD. 10/12/2023.

Coastal Orthopedics records dated 10/30//2023. Left shoulder pain. fallen several times. Two left shoulder injections. Under treatment of Texas Pain management. Under treatment of Dr. Matthew Hoch Texas pain Management. <ediatiopns include Hydrocodone 7.5 , acetaminophen 325 mg. ondansetron 4 mg. Robert S.Willimas, mD. 10/12/2023.

Coastal Orthopedics records dated 12/12//2023. Left shoulder pain and loss of function. Fallen several times. completed physical therapy without significant improvements in her pain or range of motion. Under pain management. Medications include Hydrocodone. Assessment of chronic payne due to CRPS, limited mobility in left shoulder, discomfort from implanted stimulator. Robert S.Willimas, mD. 12/27/2023.

Coastal Orthopedics records dated 01/05/2024

Assessment :Adhesive capsulitis of left shoulder (M75.02); Impingement syndrome of left shoulder (M75.42); Long term (current) use of opiate analgesic (Z79.891).

Complex regional pain syndrome type 1 of lower extremity, unspecified laterality (G90.529).Ms. Frakes has failed extensive conservative treatment for her left shoulder pain including multiple steroid injections and extensive physical therapy. She continues to have constant pain and dysfunction in the left shoulder. We discussed that she is at high risk for chronic pain given her history of CRPS.

Coastal Orthopedics records dated 01/29/2024 History of present illness

- Patient recently had left shoulder manipulation 1/10/24 - Reports ongoing shoulder pain and popping - Pain management handled by another doctor in San Antonio
- Physical therapy at Shea not yet started due to lack of availability - First physical therapy appointment scheduled for 2/6/24.

Assessment/Plan Adhesive capsulitis of left shoulder (M75.02). Impingement syndrome of left shoulder (M75.42). Complex regional pain syndrome type 1 of lower extremity, unspecified laterality (G90.529). Long term (current) use of opiate analgesic (Z79.891).

Shea Physical Therapy notice dated 08/07/2023 Diagnosis: ICD10: S43.432A: Superior glenoid labrum lesion of left shoulder initial encounter, M75.02: Adhesive capsulitis of left shoulder, M75.42: Impingement syndrome of left shoulder

Treatment Diagnosis: ICD10: S43.432A: Superior glenoid labrum lesion of left shoulder, initial encounter, M75.02: Adhesive capsulitis of left shoulder, M75.42: Impingement syndrome of left shoulder.

Assessment Diagnosis: Posterior superior labrum tear of the left shoulder. The patient's deficits include but are not limited to pain that limits patients ability to maintain upright posture, decreased ROM that limits patients ability to wash back/hair and dressing, weakness that limits their ability to complete light activities around the house and carry shopping bags. The patient's current function is significantly decreased from their prior level of function and requires skilled PT intervention in order to return to their prior level of function.

Shea Physical Therapy notes dated 08/29/2023 Assessment/Diagnosis: Patient has attended 9 sessions of therapy for strengthening and mobility to the left shoulder. Ongoing severe complaint of pain persists to the left shoulder with inability to lift the left arm

past 35 degrees flexion and 25 degrees abduction. Patient stated minimal improvement and feels ready to have more testing to see what advice orthopedist has based on the recent MRI and ongoing symptoms.Discharge formal therapy at this time.

Shea Physical Therapy notes dated 09/11/2023 Current Functional limitations:

Carrying, Moving & Handling Objects: Hand & Arm Use; Fine Hand Use; Community Integration/Access; Work/Vocation/Occupation - Restricted motion and pain to the left shoulder.

Shea Physical records also dated 09/272023,

The Lincoln National Life Insurance Company Disability and Life Claims letter dated 10/28/2023. We received notification your claim has closed. At the time your disability claim closed you were pursuing Social Security benefits.

As you know, your employer's disability plan requires us to reduce your disability benefits by the amount of income you receive from other sources, including Social Security, for yourself and any eligible dependents. A retroactive award may cause your disability claim to be considered overpaid, and you are responsible for repaying amounts paid for periods covered by your Social Security award. This obligation remains regardless of the status of your disability claim.

The last correspondence we received advised the Social Security Disability claim is still pending at the reconsideration level.

To update our files, please provide a copy of your most recent status from the Social Security Administration. This could be in the form of a Denial letter or a Notice of Award. If your claim is still pending, please keep this letter and reach out once a decision is made. If you are awarded, please provide a copy of your Notice of Award letter. Please be sure not to spend any retroactive payment you receive until we determine the overpayment of your benefits.

If you are unable to locate a copy of your most recent update, you may access this by visiting the Social Security Administration's website at www.socialsecurity.gov/myaccount where you can create an account and obtain any updates. Brown & Brown. will continue to represent you through the hearing at no charge to you. The vendor will also provide us with updates as they occur and you can disregard the above request for an update.

If you have any questions regarding this matter, please contact me.

Sincerely, Audrey Allen, Social Security Specialist I

---

The Disability Policy states that with respect to Long Term Disability "material and substantial duties "means "responsibilities" that are normally required to perform the Covered persons own Occupations, or any other occupation, and cannot be reasonably eliminated or modified." ADOP-DEF-6.

However, the final denial dated August 8, 2024 states that “as a result of technological advancement, employers are providing a variety of workstation types and associated equipment that would allow an individual opportunity to experience and sustain comfort in their respective work settings within the occupations above.” Therefore, the Defendants deny the claim based upon “workstation types and associated equipment” that could not be reasonably eliminated or modified. The Defendants do not specifically reference the additional technological advancements nor work station types that would help the Plaintiff sustain comfort, nor whether or not these modifications are reasonable; but imply that these would make the Plaintiff able to perform the cited occupations. In addition, this language regarding “technological advancement” is not part of the disability plan and is not supported by vocational expert opinion. In addition, practically speaking the workstations and associated equipment could practically make any occupation possible, especially when such work stations and equipment are not specified.

The word “Responsibilities” is not defined in the Disability Policy. This Disability Policy states, “This policy is a legal contract . . . “ (FORM ADOP.5) The defendat is apparently modifying the word "responsibilities" to include physical requirements to perform occupations. The defendant is expecting the court to extrapolate that the word “responsibilities” be morphed into the physical duties of work or the physical residual functional capacity to perform other occupations.

Apparently, Lincoln both pays and administers the Plan. Therefore, there is a conflict of interest.

The Defendant' statement that an ERISA claimant bears the burden to show that the administrator abused its discretion. See Anderson v. Cytec Indus., Inc., 619 F .3d 505, 512–13 (5th Cir.2010). "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." Holland, 576 F.3d at 246 (internal quotation marks omitted). Similarly, a decision constitutes an abuse of discretion "only if it is 'made without a rational connection between the known facts and the decision or between the found facts and the decision.' " Truitt v. Unum Life Ins. Co. of Am., 729 F.3d 497, 508 (5th Cir.2013) (quoting Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d 211, 215 (5th Cir.1999)).

The Defendants assert that Disability after 24 months means that due to Injury or Sickness the claimant is unable to perform Material and Substantial Duties of his one occupation for 24 months , and thereafter, the covered Person is unable to perform , with reasonable continuity, the material and Substantial Duties of any occupation. (ADOP-DEF-3) "Material and Substantial Duties" with respect to Long Term Disability, means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." ADOP-DEF-6). The Defendant Lincoln provided no modification, but tacitly admitted that she would need such modifications in their denial for Disability, but did not state the modifications.

---

March 14, 2024 letter Lincoln Financial Group: "Appeal Nursing Memorandum" (187-192)

"On September 7, 2021, urgent care providers endorsed restrictions after the employee was seen on this day. Per this letter the employee was unable to work due to worsening right foot neuropathy (pain due to nerve damage) causing unsteady gait and falls, she was unable to lift, push, pull or twist, was referred to orthopaedic for further evaluation.

On September 13, 2021, the employee was seen by Dr. Robert Williams, orthopaedics, for evaluation of right foot pain and toes. The employee had undergone removal of a right arch fibroma (mass) on April 21, 2021, performed by Dr. Larkins. She has been released by this provider. She is having severe right foot pain and difficulty with weight bearing. She notes she had a similar procedure on the left with good result. On exam she had mild bruising and swelling in the foot, tenderness in the incision sight. Neurovascular exam of the lower extremity was normal. Clinical presentation is consistent with complex regional pain syndrome (type of chronic pain that develops after an injury). (187)

MRI of the right foot on September 22, 2021, showed thickening along the surgical site compatible with pc>stsurgical changes. Tendon tear noted and chronic rupture of the ligaments in the hindfoot noted.

On October 4, 2021, the employee was referred to an orthopaedic surgeon for

evaluation.

Dr. Williams completed an attending physicians statement on October 15, 2021, endorsing restrictions pending appointment with orthopedic surgeon.

On December 16, 2021, the employee was seen by Dr. Mark Casillas, orthopaedic surgeon, for evaluation of right plantar (bottom) foot pain. Per this note the employee had ankle reconstruction done for an ankle fracture in the past. She is unable to weight bear withoutfalling. On exam she had moderate swelling in the right foot with tenderness, limited motion in the toes with pain, positive Tine!'s sign at the tarsal tunnel (suggestive of nerve damage in the inside of the ankle), normal motion in the ankle. Diagnosis of complex regional pain syndrome type I of the right lower extremity. Recommended physical therapy to treat for pain desensitization.

On January 6, 2022, the employee underwent an MRI of the left shoulder due to pain. Tendinosis noted (degeneration of the tendon). An MRI of the lumbar spine was also performed due to back pain. There was evidence of disc protrusion/herniation on the SI nerve root bilaterally, impingement on thecal sac (covering of the spinal cord) at additional levels of the lumbar spine.

On February 3, 2022, Dr. Casillas provided an out of work note thru March 1, 2022, noting the employee has been referred to another physician. The employee was seen this day and was referred for tendon sheath injection in the right tarsal tunnel.

On February 8, 2022, the employee was seen by Dr. Raul Martinez, pain medicine, for her foot pain. On exam she had decreased plantar flexion in the right ankle with hyperesthesia (sensitivity to touch) allodynia (pain due to a stimulus that does not normally provoke pain) skin discoloration to the right foot region with swelling and decreased motion and motor function to the foot. She also had decreased toe extension and flexion. Diagnosis of complex regional pain syndrome of lower limb and right foot pain. The employee has tried therapy and neuropathic pain medications with no relief. Additional therapy recommended, discussed advanced pain therapy including spinal cord stimulator and sympathetic nerve blocks (injections around nerve roots for chronic pain). She was endorsed out of work and was to undergo right lumbar sympathetic blocks to try to break the pain cycle. The employee is overweight and was counseled on weight loss.

On February 23, 2022, the employee underwent her first lumbar sympathetic block. Her second procedure was completed on March 1O, 2022. Third lumbar sympathetic block was performed on April 1, 2022.

On April 27, 2022, the employee returned to pain management and was seen by Molly Trevino, nurse practitioner. She reported 40 % relief with most recent block. X-rays ordered; she was started on Cymbalta trial (anti-depressant that also provides pain relief).

On June 22, 2022, the employee returned to pain management and was seen by Dr. Matthew Hoch. She presented *with* foot and low back pain on the left side. Cymbalta

did not help alleviate her pain. She had no change to right lower extremity examination. Updated imaging of the lumbar and thoracic spine ordered as well as psychological evaluation for consideration of spinal cord stimulator therapy.

MRI of the thoracic spine on July 25, 2022, showed mild degenerative disc disease with mild spondylosis and facet arthropathy (degenerative disease). No disc herniation offoraminal stenosis seen. (188)

On July 28, 2022, the employee returned to pain management and was seen by Dr. Hoch for low back pain. She was seen for implantation of epidural spinal cord stimulator trial (implanted device that sends signals to the spinal cord to relieve pain).

On August 4, 2022, the employee returned to Dr. Hoch for her low back pain and right foot pain. She reported swelling to the foot has reduced and she is able to stand longer, going up and down stairs is less painful. Numbness has decreased. Able to perform most activities of daily living with pain. 70 % improvement in pain noted. Given the successful trial, she was referred to surgical specialist for permanent implantation.

On January 23, 2023, the employee was seen by Dr. Ian McDougall, neurosurgery. Per this report the employee was seen about 4 months ago with infection around the spinal cord stimulator site from another surgeon. Infection was cleared with IV antibiotics. She presents for consideration of re-implantation. Procedure to be scheduled in 4-6 weeks pending insurance authorization.

On June 8, 2023, the employee returned to Dr. Hoch for low back pain that radiates to

the right leg as well as foot pain. Second spinal cord stimulator implant was placed in March 2023. Provides about 40% relief of pain. She reports sharp pain in her head when she uses the stimulator. On exam she had pain with range of motion of the right foot. She was started on hydrocodone for severe pain. Spinal cord stimulator device was reprogrammed to help improve pain coverage of toes.

On June 15, 2023, the employee was seen in urgent care due to left shoulder joint pain. X-ray of the left shoulder showed no acute fracture or malalignment. She had mild osteoarthritis.

On July 10, 2023, the employee was seen by Dr. Williams for left shoulder pain and loss of function. She notes falls several times due to her complex regional pain syndrome in the right lower extremity. On exam she had diminished range of motion, weakness and positive impingement signs. (189)

MRI of the left shoulder was done on July 25, 2023, showed thickening of ligaments with edema that correlate with signs of adhesive capsulitis (causes shoulder stiffness) mild tendinosis without rotator cuff tear and tearing of the labrum (in the shoulder).

On August 1, 2023, the employee returned to Dr. Williams. She was given an injection into the shoulder which resulted in some improvement in motion but still diminished. She had weakness and positive impingement signs. She was  referred for a course of physical therapy for 4 weeks.

On August 3, 2023, the employee returned to Dr. Hoch for pain management follow up of shoulder pain and foot pain. She was stable on hydrocodone. Injections in the

shoulder provided no relief, she requested an increase in medication. She had diminished motion in the left shoulder. She was doing well with the spinal cord stimulator and hydrocodone that keeps the pain tolerable. She was to increase hydrocodone if needed for shoulder pain during fairly aggressive physical therapy.

On August 7, 2023, the employee underwent physical therapy initial evaluation for her left shoulder. She attended physical therapy on August 9, 10, 14, 16, 18, 21 and 22, 2023.

On August 29, 2023, the employee had a progress report completed from physical therapy. Pain persists in the left shoulder with inability to lift the left arm past 35 degrees of flexion, 25 degrees of abduction. She has had minimal improvement and is ready to have more testing from orthopaedics. For this reason, she was discharged from formal therapy.

On September 6, 2023, the employee returned to orthopaedics and was seen by Kimberly Petrila, physician's assistant for left shoulder pain and loss of function. She continued to show weakness and positive impingement signs in the left shoulder with diminished motion and significant guarding. Injection provided into the left shoulder. Provider opines that the employee has full external rotation which is unusual for adhesive capsulitis. She also notes motion overhead triggers her spinal cord stimulator and shocks her. She was referred back to another course of physical therapy.

On September 7, 2023, the employee was seen by Dr. Ian McDougall,

neurosurgeon, for malposition of her spinal cord stimulator generator, it likely migrated due to 40 pound weight Joss. Discussed surgery to revise site position as she bangs it more often and sits on it.

On September I I, 2023, the employee returned for evaluation with physical therapy to resume therapy for her left shoulder adhesive capsulitis. Plan was for 3 times a week for 3 weeks.

She attended physical therapy on September 12, 14, 18, 19, 21, 25 and 26, 2023.

On September 27, 2023, a progress report from physical therapy notes very little improvement with therapy. She reports an increase in pain in the left shoulder and all over pain in her joints. She was awaiting surgery to reposition tl1e stimulator. She was discharged from physical therapy due to pending surgery and little to no improvement. (190)

On October 3, 2023, the employee returned to Dr. Williams for her left shoulder pain. She reported no improvement in symptoms witl1 physical therapy. Discussed possibility of shoulder surgery.

Per an after visit summary, the employee was seen by neurosurgery on October 13, 2023.

On October 13, 2023, a peer review from a physical medicine and rehab perspective was completed. Please see report for complete information.

On October 19, 2023, the employee returned to Dr. McDougall for postop visit after her spinal cord stimulator generator site was repositioned. She reports significant discomfort as the generator contacts her lateral ribs. There were no signs of infection noted, she was given a steroid dose pack for any potential inflammation and refilled pain medication.

On October 30, 2023, the employee returned to Dr. Williams for orthopaedic follow up of left shoulder pain. Dr. Hoch was contacted who advised the employee was not a good candidate for shoulder surgery due to her history of complex regional pain syndrome. She was to see Dr.
Hoch and consider further pain management intervention.

On December 12, 2023, the employee returned to Dr. Williams. She continues to show diminished motion in the shoulder, weakness and positive impingement signs. The employee was considering manipulation under anesthesia for her shoulder (procedure to break up excessive scar tissue in the shoulder joint). (190)

On January 5, 2024, the employee returned to orthopaedics and was seen by PA Petrila. She was scheduled for the manipulation under anesthesia procedure and was being seen for pre-op clearance.
Provider notes she has failed extensive conservative treatment for her left shoulder pain, has constant pain and dysfunction in the left shoulder.
Discussed she was at high risk for chronic pain given her history of

complex regional pain syndrome, she voiced understanding.
She stated she has resigned herself to living with chronic pain and has been told it will worsen.

On January I0, 2024, the employee underwent a manipulation under anesthesia of the left shoulder with injection into the left shoulder performed by Dr. Williams.

On January 29, 2024. The employee returned to orthopaedics and was seen by PA Petrila. She reports ongoing shoulder pain and popping. No physical therapy yet due to lack of availability, first session scheduled for February 6, 2024. She is still under treatment with pain management. She had limited motion in the shoulder.

The employee was also seen in urgent care on January 29, 2024, due to complaints of lung pain. Provider opines that her complex regional pain syndrome has evolved to cause pain in her lungs. Recommended a rheumatology evaluation and functional capacity evaluation.

On February 15, 2024, the employee was seen for a functional capacity evaluation. Evaluation notes that she qualifies under sedentary work but verbalized inability to tolerate 8 hours of work, rather able to tolerate maximum of 1 hour with light duty. Accommodations included avoiding prolonged sit and stand, driving, walking, walking on uneven surfaces, squatting, kneeling, climbing stairs and ladders, lift/carry more than 3

pounds, frequent breaks every 5-10 minutes. (191)

On February 20, 2024, the employee provided a letter in response to denial of her long term disability. Letter reviewed in its entirety which outlines her clinical history. She is awaiting rheumatology evaluation, also notes recent functional capacity evaluation. (191)

On February 28, 2024, a letter from Jace Cain, nurse practitioner, urgent care, notes the employee has been a patient since 2022, she has complex regional pain syndrome that significantly impacts her ability to perform voluntary and functional activities.

In summary, the employee initially separated from the workplace in September 2021, due to the development of complex regional pain syndrome in her right foot after surgery performed in April 2021. The employee had tried physical therapy and neuropathic pain medications without relief. She underwent lumbar sympathetic blocks and eventually underwent a spinal cord stimulator placement. Pain was managed with this and hydrocodone. In June 2023, the employee had ongoing left shoulder pain and loss of function. She was diagnosed with shoulder impingement and referred for course of physical therapy in August 2023. There was minimal improvement in the shoulder, and she eventually underwent manipulation under anesthesia of the left shoulder in January 2024. The employee also required repositioning of the spinal cord

stimulator generator that had moved from the initial placement. She is pending a rheumatology evaluation as of February 2024. A functional capacity evaluation was performed on February 15, 2024, from which NP Cain had indicated her conditions significantly impacts her ability to perform voluntary and functional activities.

Based on the available medical evidence, it is unclear if the restrictions as outlined in the functional capacity evaluation are reasonable and supported. Therefore, to evaluate the employees physical condition and any restrictions and limitations ongoing, recommend a full file review with physical medicine and rehab.

Advised claim resolution consultant case review is completed, no further activity is required.

Sharon H.. RN, BSN, CCM, Nurse Disability Appeals Consultant, Lincoln Financial Group (192)

---

The Plaintiff through counsel Di Carlo wrote a letter on May 23, 2024 to “Claims Specialist” Nakeshia Killian that counsel Di Carlo represented the Plaintiff; Di Carlo reviewed her letter dated May 8, 2024, with an attachment from George Kum-Nji, MD dated 05/06/2024; that based upon a voluminous record Di Carlo requested ten additional days to comment on this additional evidence, that is until June 6, 2024; That her letter dated May 8, 2024 states that Mrs. Frakes continued to experience chronic

pain functional limitations, and the previously listed limitations continue to apply; That most glaring in the 03/28/24 "Peer review" is the portion which states, on page eight (8): "Functional Assessment dated 02/15/24 indicates the claimant is only able to tolerate light-duty work with accommodations, such as avoiding prolonged sitting, standing, walking, and lifting. However, the restrictions clearly state that she is limited to "sedentary work", and light work, if, for no other reason, she could only lift, carry, push and pull up to 10 pounds. See, Dictionary of Occupational Titles, Appendix C, IV.c. (4th. Ed., Rev. 1991). Mrs. Frakes objects to your mischaracterization as to her ability to perform light work; The 03/28/24 letter states Mrs. Frakes requires restrictions and limitations as outlined below: Sitting: Unrestricted. Standing: Occasionally. Walking Occasionally." Clearly, Mrs. Frakes is limited to "avoid prolonged sitting" and yet the restrictions and limitations state she is "unrestricted" as to sitting. Therefore, the sitting limitations are not unrestricted, and she is to avoid prolonged sitting. Mrs. Frakes objects to your stating that her sitting is "unlimited", when it is limited to "occasional"; The Dictionary of Occupational Titles is utilized in establishing what jobs the claimant could perform on 04/08/2024. All of the jobs have a "sedentary" strength requirement. It is well known by vocational experts that Sedentary Work requires the ability to sit 6 hours out of an 8 hour day. "Sedentary work involves sitting most of the time." Dictionary of Occupational Titles, Appendix C, IV.c. (4th. Ed., Rev. 1991). In addition, on February 15, 2024 Mrs. Frakes were specifically limited to sedentary work by a functional capacity evaluation. Mrs Frakes objects to your finding that she could

perform sedentary occupations listed when she clearly cannot sit an adequate amount of time to perform these occupations.

Continuance of claimant's letter through counsel Di Carlo: Mrs. Frake's claim file, in my possession, is replete with objective medical evidence and her own uncontradicted statements regarding neck and back problems. For example, the objective medical evidence includes X rays dated 04/25/24 from Lone Star Urgent Care which state that there is a spinal cord stimulator; Mild multilevel disc height loss most prominent at L3-4 and L4-5; and, mild to moderate facet sclerosis at L4-L5and L5-S1bilaterally.

Mrs. Frakes own statements regarding problems sitting are also stated in a letter from the claimant dated 04/22/24 stating she was suffering chronic pain to her left rib and hip region while sitting and standing. See George Kum-NJi, MD statement made on 05/06/24, page 1, paragraph 2.

In your letter dated May 8, 2024 you request an additional 45 days to make your appeal determination under ERISA laws. Pursuant to 29 C.F.R. § 2560.503-1(f)(3), the claim administrator must make a claim decision on a disability claim within 45 days. However, this deadline can be extended twice, by 30 days each time, "provided that the plan administrator notifies the claimant … of the circumstances requiring the extension and the date as of which the plan expects to render a decision. . . . " However, Mrs. Frakes was not given notifications of the circumstances which require the extension, and objects to your request to a 45 day extension because only a 30 day extension is

permitted and because you do not state what is the requested documentation you are waiting for Lastly, Mrs. Frakes objects to the obfuscatory manner in which you are denying her claim and asserts that the denial is in violation of 29 CFR § 2560.503-1. The March 14, 2024 letter is apparently your denial letter, and if it is not please provide the denial letter.

My brief file review indicates that basically you are only summarizing medical records which exist in the claim file, and forwarding the unfortunate Mrs. Frakes such summaries. And then issuing contradictory statements that she is limited to light work, while it is actually sedentary work, and providing occupations as based upon a 04/08/2014 Vocational Memorandum that she could perform sedentary work based upon criteria which is not listed in the vocational assessment.

Please forward the claim file, the plan, and the summary plan to me within ten days.

Sincerely, Mark A. Di Carlo (This letter is not included in the claim file in the Plaintiff's possession.)

---

A June 6, 2024 to Mark A. Di Carlo, PLLC from Kimberly Frakes, stating Lincoln National Life Insurance Company (Lincoln) is responsible for managing claims for Long Term Disability (LTD) benefits under the SavaSeniorCare Group Disability LTD Policy. Also, states they are in the process of reviewing Mrs. Frakes' appeal of their denial

determination; The purpose of *this* letter

and encloser(s) is to provide you with an opportunity to review and comment-on new/ additional evidence that has been received before a decision is rendered on her appeal. There is an attached medical review which you may review and provide a response to us, by June 26, 2024. Under the Employee Retirement Income Security Act (ERISA), an appeal determination should be rendered within 45 days of receipt of appeal, unless there are special circumstances beyond Lincoln' control, which require a delay in making a determination. If additional time is needed.

ERISA allows for a 45 day extension to evaluate and render an appeal decision.

Pursuant to ERISA Regulations, additional time for a final decision may exceed 90

days to the extent that the timeframe is tolled while Lincoln is awaiting receipt of

requested documentation needed to fully evaluate her claim.

---

The Plaintiffs by counsel Di Carlo June 25th, 2024 letter states: An objection regarding confusion about various letters and denials; That the June 6, 2020 letter from them attached a medical review by Dr. George Kum-Nji with a "clarification" on page one (1) apparently written by an agent employee of Lincoln Financial requesting additional restrictions related to sitting; Inquiring whether Dr. George Kum-Nji , MD was supplied the Plaintiff's appeal letter dated May 23, 2024; That you are in accord with the sitting limitations by Ms. Frakes, and Dr. Kum-Nji or you would not have queried him regarding a clarification; That the new assertions by Dr. Kum-Nji on June 5, 2024 that the Plaintiff Frakes could sit for one hour, with a 5 minute break every hour is not

supported by the medical record; Dr. Kum-Nji's letter does not reference medical records which would change his previous positions about sitting, and the addendum records you provided to him are not provided so the Plaintiff could comment on appeal; Dr. Kum-Nji did not treat nor examine the plaintiff to make these new limitations; Dr. Kum-Nju does not explain why he recently stated the

Plaintiff is to avoid prolonged sitting, that there is no improvement cited, and yet now on June 5, 2024 Dr. Kum-Nji states she could sit 8 hours out of an 8 hour day; Fourth, Dr. George Kum-Nji on June 5, 2024 neither references medical records which would change his previous positions, nor are the "addendum records" you provided to him provided to the claimant Plaintiff so we might make appropriate comment or appeal.; Sixth, Dr. George Kum-Nji makes no explanation as to why he recently stated she is to avoid prolonged sitting, there is no improvement in her condition cited and yet now on June 5, 2024 Dr. George Kum-Nji states she can sit for 8 hours out of an 8 hour day.

The Plaintiff's June 25, 2024 letter states that Dr. Kum-Nji, MD is not an expert under various the standards of Daubert v. Merrell Dow; as it is not ground the methods and procedures of science; his opinion was not based upon the scientific method; it is not sufficiently tied to Ms. Frakes case; etc. In addition, Dr. Kum-Nji's statement on June 5, 2024 is in violation of Federal Rule of Civil Evidence 702 and Federal Rule of Civil Evidence 703 including that he has not reliably applied the principles and methods to the facts of the case; and, experts in the field would not reasonably rely upon the facts and data in forming an opinion.

The Plaintiff's letter states: There is no explanation on why Dr. Kum-Nji changed his opinion from his March 28, 2024 review form avoiding prolonged sitting to June 5, 2024, about 9 weeks later.

Regarding your June 25, 2024 letter, which contains 13 pages of attachments. I am not in a position to properly address that letter, by July 4, 2024 letter but I note it does not contain Dr. Kum-Nji's opinion dated June 5, 2024; and, which you previously enclosed.

Dr. Kum-Nji's 05/06/24 letter attached to your June 25, 2024 states, "She (Mrs. Frakes) is not currently physically or mentally able to return to any type of work duties employment."

Mrs. Frakes is requesting that you immediately begin her long term disability, as she is disabled according to Dr. Kum-Nji; and, is not capable of performing an occupation; and your decision is based upon an abuse of discretion.

Please tender a supplemental claim file within ten days; and please include this letter in the claim file. (The Plaintiff's letter is not contained in the claim file, the Plaintiff has in her possession)

---

`The Plaintiff received a July 10, 2024 letter from Lincoln National Life Insurance regarding Long Term Disability (LTD) Benefits SavaSeniorCare Lincoln National Life Insurance Company (Lincoln) is responsible for managing claims for Long Term Disability (LTD) benefits under the SavaSeniorCare Group Disability LTD Policy. We are writing regarding Mrs. Frakes' claim for LTD benefits under the Policy.

The July 10, 2024 letter states they are in the process of Mrs. Frakes' appeal of the denial; the purpose of this letter is to provide you with an opportunity to review and comment on new/ additional evidence; You may review these and provide a response to us, which we will consider in making our decision on your appeal. If we do not receive your response within 21 days of the date of this letter or July 30, 2024, we will proceed with making a detennination; Upon the response, we will promptly complete our review and render a detennination on her appeal. If your response is not received by

July 30, 2024 (21 days from the date of this letter), we will render a determination based on the information contained in her file. Due to these special circumstances, an extension of time to process your appeal is required and we are exercising our right to take such an extension under the Employee Retirement Income Security Act.

Under the Employee Retirement Income Security Act (ERISA), an appeal detennination should be rendered within *45* days of receipt of appeal, unless there are special circumstances beyond Lincoln' control, which require a delay in making a detennination. If additional time is needed, ERISA allows for a 45-day extension to evaluate and render an appeal decision. Pursuant to ERISA Regulations, additional time for a final decision may exceed 90 days to the extent that the timeframe is tolled while Lincoln is awaiting receipt of requested documentation needed to fully evaluate her claim. (rolled: accumulation of time is suspended.)

---

Plaintiff's July 12, 2024 letter to Nakeshia Killian, Claims Resolution Specialist: I received your letter dated July 10th 2024, with an attachment from Jason Miller M. Ed. dated July 9th, 2024 with a listing of seven occupations that Mrs. Frakes is qualified to perform, given an apparent ability to perform sedentary work with nearly no limitations in sitting, based upon Doctor George Kum-Nji, MD's new sitting limitations. Of course of note, the sitting limitations were queried of the Doctor, after we had pointed out Mrs. Frakes' obvious inability to sit for an adequate period of time to perform sedentary work.

It appears that whenever we make objections, you merely hire an expert to overcome those objections, or attempt to lead one of your in-house experts to substantiate your prior denial.

And that prior denial was not substantiated by the record at that time. However, Dr. Kum-Nji MD states Mrs. Frakes is not currently physically or mentally able to return to any type of work duties employment. Dr. Kum-Nji is board certified in physical medicine; and, his opinions appeared definitive.Dr. Kum-Nji, MD's statement in his May 6th, 2024 addendum that Mrs. Frakes is not currently able to return to work duties due to mental limitations is not included in your queries to vocational expert Jason E. Miller. Your repeated attempts to formulate a record to justify your denial of disability decisions, after we have made our objections, cannot support a conclusion that the Plaintiff Frakes is not disabled. The Plaintiff's letter to Nakeshia Killian dated, July 30, 2024 states in pertinent part: There is some confusion regarding your denials; which overlap Frakes appeals. For example, claimants through counsel faxed over an appeal letter

on July 11, 2024 dated July 12, 2024, which responded to the July 10, 2024 letter. Counsel then received a letter from you dated July 11, 2024. Please consider our July 11, 2024 as responsive as it addresses why Ms. Frakes cannot perform the occupations referenced in the vocational memorandum by Jason E. Miller, M.Ed. dated July 9, 2024.

These reasons include: That she could not perform these occupations as they are sedentary and require the ability to sit six hours out of an eight hour day; and mental limitations are not considered by the vocational expert.

---

10/25/2023 Letter from Lincoln Financial Group to Plaintiff Kim Frakes from Margaret Labossiere, “LTD Claim Specialist”: We are writing in reference to your claim for LTD benefits under the Policy. SavaSeniorCare’s Policy contains a change in the definition of disability, which

states: "Disability" or "Disabled", with respect to Long Term Disability, means: 1. For persons other than pilots, co-pilots, and crewmembers of an aircraft: Applicable to Class 1: a. if the Covered Person is eligible for the Maximum Own Occupation benefit, "Disability" or "Disabled" means during the Elimination Period and until the Covered Person reaches the end of the Maximum Benefit Period, as a result of an Injury or Sickness, he is unable to perform the Material and Substantial Duties of his Own Occupation. If the Covered Person is eligible for the 24 Month Own Occupation benefit, "Disability" or "Disabled" means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable

to perform the Material and Substantial Duties of his Own Occupation; and thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation. Since your benefits began on March 8, 2022, the change in the definition will occur on March 7, 2024. You have been receiving LTD benefits for your disability since March 8, 2022.

"In order to evaluate whether or not you continued to meet the above definition of disability, we requested medical information from your physician(s). You submitted a claim for CRPS and your claim file contains the following medical documentation: Office visit notes from: Dr. Casillas dated December 16, 2021; from Dr. Williams dated January 21, 2021 through August 1, 2023; From Dr. Hoch dated September 22, 2021 through August 3, 2023; From Dr. McDougal dated January 23, 2023 through September 7, 2023; From Dr. Melenevsky dated June 15, 2023 through July 10, 2023; From Shea Physical Therapy dated September 7, 2023; From Coastal Orthopedics dated September 22, 2021.

"(Y)our file was referred for a medical review by a consulting physician Board Certified in Physical Medicine and Rehabilitation. The following was opined:

The claimant is a 50-year-old female who initially had a right ankle reconstruction in 2020 after a fracture. Subsequently in April 2021 the claimant had a fibroma removed from that right foot. Since that time the claimant has reportedly had increased pain, discoloration and swelling in the foot. Ultimately, in September 2021 the claimant was taken out of work due to this pain. The claimant had failed trials of gabapentin and pregabalin. She also had

undergone three right-sided sympathetic blocks which did not provide long-standing relief.

Ultimately the claimant had a trial of a spinal cord stimulator in July 2022. This and a permanent stimulator was placed in September 2022. Soon after this, the stimulator became infected and ultimately needed to be removed. Another spinal cord stimulator was then placed in March 2023 with good results. In the last note from Dr. Hoch, her pain management specialist in August 2023, the claimant was doing well with her foot pain. She continued to get relief from the spinal cord stimulator and the medications. She was having more left shoulder pain at this time with decreased range of motion. The claimant was then seen for moving the spinal cord stimulator in September 2023 due to the fact that she had lost weight. She had the spinal cord stimulator removed on 9/29/23. She was seen in follow-up two weeks later and was doing well. Sutures were removed.

The claimant has continued to have impairment of right foot pain and swelling. Due to this impairment she would have the following restrictions and limitations:

1) No lift, push, pull greater than 10 pounds occasionally

2) Sit continuously with change of position every hour for five minutes

3) Stand and walk occasionally

4) Occasional bend, stoop

5) No crouch, crawl, kneel

6) No limits on fingering, grasping and handling

There is nothing in the medical record to suggest an inability to perform within these restrictions and limitations for an eight hour day. These restrictions are agreed upon by her treating provider. The claimant has had ongoing pain in the right lower extremity related to CRPS. The claimant continues to be managed with the spinal cord stimulator and medications which had helped. There is nothing else to do for this condition and thus these restrictions related to the right foot pain would be deemed permanent.

Beside this pain the claimant also has had increased left shoulder pain. The claimant has had MRI of the left shoulder revealing thickening of the glenohumeral ligament with. periligamentous edema. Her physical exam is also consistent with an adhesive capsulitis. The claimant has undergone a corticosteroid injection and is undergoing physical therapy. Beside the restrictions above, the claimant is also limited to no overhead reaching with the left arm.

Although the restrictions above would be permanently related to her CRPS, the claimant may be able to reach overhead with the left arm depending on her response to treatment for the adhesive capsulitis. The claimant's lifting restrictions however would remain the same.

On October 13, 2023 our consulting physician made phone contact with Austin Morrison, NP who works with Dr. McDougall. This is a summary of that call:

He noted the claimant was seen for her CRPS. She has had continued right foot pain and burning. She recently underwent transposition of her spinal cord stimulator at the end of . She recently returned for follow-up to have sutures removed and stimulator was

noted to be in place. He noted that she was healing well and would be able to perform at a

sedentary level. The restrictions and limitations would include:

1) No lift, push, pull greater than 10 pounds occasionally

2) Sit continuously with change of position every hour for five minutes

3) Stand and walk occasionally

4) Occasional bend, stoop

5) No crouch, crawl, kneel

6) No limits on fingering, grasping and handling

Additionally, your file was referred to a Vocational Specialist to conduct a vocational analysis of your current capabilities, training, education, and experience. The review identified your transferable skills as:

Skills & Abilities: Manual/Technical – Working under the supervision of a licensed occupational therapist to assist with patients treatment programs, conducting resident screens, helping residents with rehabilitative activities and exercises outlined in a treatment plan, monitoring patient activities to make sure they are performed correctly, providing encouragement, recording progress for use by the occupational therapist, providing training to residents, caregivers, and families according to the resident's care

plan, completing required forms and documents, responding to emergency situations, maintaining safety and well-being of patients and residents, demonstrating knowledge of occupational therapy and medical terminology. Clerical/Administrative – Assisting in scheduling appointments, answering the telephone, restocking, ordering depleted supplies, filling out insurance forms or other paperwork, performing routine office work using basic clerical skills, organizing and recording information, performing data entry operations. Communication/Interpersonal – Speaking effectively, listening attentively, informing and consulting with both staff and customers, demonstrating care and concern, collaborating with others, working well as part of a team. Customer Service – Answering questions, clarifying and explaining information, interacting with diverse populations, working well

with the public, handling customer issues and complaints, utilizing problem solving skills. Organizational – Demonstrating efficiency and ability to get a job done, utilizing time management skills, multi-tasking, understanding and applying both written and verbal instructions

Based on this information you have the ability to perform the following occupation(s):

Occupation - National Monthly Wage

Hospital - Admitting Clerk - $3,226.00

Customer Service Representative - $3,148.00

Information Clerk - $2,831.00

Receptionist - $2,831.00

Appointment Clerk - $2,831.00

Order - Control Clerk, Blood Bank - $3,172.00

We have completed a thorough review of your eligibility for benefits beyond March 7, 2024, based on the medical and vocational information contained in your file, and have determined that you will not be eligible for benefits beyond March 7, 2024.

If benefits are awarded retroactive to your period of disability with The Lincoln National Life Insurance Company, you are expected to repay the amount of any other benefit you would have received during the time period that you received disability per the language of the disability Policy. Should The Lincoln National Life Insurance Company receive notification of any such award, a representative from our Financial Review Services will notify you regarding any repayment due.

There are two options available to you at this time regarding this notice.

If you are providing the requested information, please send it to my attention at the address listed on the letterhead or you may fax the information directly to my attention at (603) 334-0380. Once received, we will immediately reconsider your benefits.

If you do not intend to send us any new information such as the information described above and you disagree with our decision, you may also appeal our determination by following the steps outlined below.

This claim determination reflects an evaluation of the claim facts and the Policy provisions. No internal rules, guidelines, protocols, standards or other similar criteria were relied upon in rendering the claim determination. We reserve the right to make a determination on any additional information that may be submitted.

Right to Appeal Under the Employee Retirement Income Security Act of 1974 (ERISA), you may request a review of this denial by writing to: The Lincoln National Life Insurance Company

The written request for review must be sent within 180 days from later of the change in definition date March 7, 2024 or the receipt of this notice and state the reasons you feel your claim should not have been denied. In your request for review please include the following documentation:

All documentation from Dr. McDougal, and / or any of your other treating providers that would show evidence that you do meet the definition of disabled continuously from Any Occupation beyond March 7, 2024 such as: test results with positive findings, such as an MRI or CT Scan, or, office visit notes that document physical exam findings, hospitalization records, lists of prescription medications with their start date/dosages, a detailed treatment plan which would outline a description of your specific restrictions and limitations, and any physical or occupational therapy records.

A full copy of your Social Security Administration (SSA) disability benefit claim file including any IMEs that may have been performed on behalf of the SSA.

You are entitled to receive, upon request and free of charge, copies of all claim file documents relevant to the claim determination. If The Lincoln National Life Insurance Company does not receive your written request for review within 180 days from later of the change in definition date March 7, 2024 or the receipt of this notice, our claim decision will be final, your file will remain closed, and no further review will be conducted.

Under normal circumstances, you will be notified of the final decision within 45 days from the date your request is received.

If special circumstances cause a delay in our decision, you will be notified of the final decision no later than 90 days from the date your request is received.

Apparently attached to the 10/25/2023 letter was the 10/25/2023 “Transferrable Skill Analysis dated 10/18/2023, and signed Nicole Hall, MS, CRC, which states the Benefit Amount is $3,640.00.

A Transferable Skills Analysis utilizing the Occupational Access System (OASYS) was completed to assess the insured’s transferable skills to determine if alternative occupations exist in the national economy.

Employer provided Job Description, Training Education, and Experience (TE&E) form, Physical Medicine & Rehabilitation Peer Review by Dr. Monti, M.D., dated 10/13/23, OASYS, Economic Research Institute (ERI) Occupational Assessor

Education & Training: Education: High School Diploma, Associates Degree Certifications/Licensures: Certified Occupational Therapy Assistant Computer Skills: As outlined within the employer provided job description “Assisting in scheduling

appointments, answering the telephone, restocking, ordering depleted supplies, filling out insurance forms or other paperwork."

Last 15 years of Work History: Manual/Technical – Working under the supervision of a licensed occupational therapist to assist with patients treatment programs, conducting resident screens, helping residents with rehabilitative activities and exercises outlined in a treatment plan, monitoring patient activities to make sure they are performed correctly, providing encouragement, recording progress for use by the occupational therapist, providing training to residents, caregivers, and families according to the resident's care plan, completing required forms and documents, responding to emergency situations, maintaining safety and well-being of patients and residents, demonstrating knowledge of occupational therapy and medical terminology

Clerical/Administrative – Assisting in scheduling appointments, answering the telephone, restocking, ordering depleted supplies, filling out insurance forms or other paperwork, performing routine office work using basic clerical skills, organizing and recording information, performing data entry operations Communication/Interpersonal – Speaking effectively, listening attentively, informing and consulting with both staff and customers, demonstrating care and concern, collaborating with others, working well as part of a team  Customer Service – Answering questions, clarifying and explaining information, interacting with diverse populations, working well with the public, handling customer issues and complaints, utilizing problem solving skills  Organizational – Demonstrating efficiency and ability to get a job done, utilizing time management skills, multi-tasking, understanding and applying both written and verbal instructions

Restrictions and Limitations: Restrictions and Limitations used for this analysis was based off the Physical Medicine & Rehabilitation Peer Review completed by Dr. Monti, M.D., dated 10/13/23. Restrictions:

• "No lift, push, pull greater than 10 pounds occasionally

• Sit continuously with change of position every hour for five minutes.

• Stand and walk occasionally • Occasional bend, stoop • No reaching overhead on the left • No crouch, crawl, kneel • No limits on fingering, grasping and handling"

Profile Adjustments:

SVP: No adjustments made

GED: Adjusted to reflect the insured's Associates Degree (Grades 13-14).

Physical adjustments were made to reflect the insured's physical abilities as noted above. Strength was adjusted to Sedentary.

Reaching was adjusted to "constantly," however any alternate occupation identified through the OASYS analysis was reviewed for the frequency of reaching overhead with the left extremity given the above noted restriction.

Environmental Conditions were adjusted to "unknown" as limitations were not specified.

Noise: Adjusted to "very loud" as no noise limitations were provided.

Aptitudes: No adjustments made

Situations adjustments, including performing repetitive or short-cycle work, influencing people in their opinions, attitudes, and judgments, performing a variety of duties, and working under specific instructions, were adjusted to "yes" to reflect the

insured's ability to complete routine natured duties and tasks such as scheduling appointments and restocking supplies, positively motivate and influence patients/residents during therapy sessions to provide encouragement, complete a range of medical support tasks, and follow specific instructions under the direction of a licensed occupational therapist.

Data adjustments, including coordinating, copying, and comparing, were adjusted to "yes" to reflect the insured's ability to complete work tasks in an organized sequence of operations according to patient treatment programs, use basic computer and clerical skills to maintain documentation and input information into the computer, and utilize visual comparison skills when observing patients during treatment sessions to ensure safety and correct activities.

People adjustments, including serving and taking instructions-helping, were adjusted to "yes" to reflect the insured's ability to tend to the needs and requests of residents and patients, and follow orders from the licensed occupational therapist.

Things adjustments, including operating-controlling and handling, were adjusted to "yes" to reflect the insured's ability to operate, control, and physically handle objects, including computer and clerical equipment.

Summary: The Transferable Skills Analysis identified occupations that are within the insured's physical abilities and identified skills level.

Examples of Occupations identified based on National labor market and the insured's ability profile analysis:

DOT Code Occupation Strength National Monthly Wage

205.362-018 Hospital-Admitting Clerk- S -$3,226

239.362-014 Customer Service Representative- S- $3,148

237.367-022 Information Clerk- S-$2,831

237.367-038 Receptionist-S-$2,831

237.367-010 Appointment Clerk-S-$2,831

245.367-026 Order-Control Clerk, Blood Bank-S- $3,172

*Wage Information is based on median 2022 Bureau of Labor Statistical Data

Updated 10/18/23

Note: the occupations listed above have been verified through a review of physical demands from the ERI, and/or a review of material and substantial functions where data does not exist in the DOT or is considered out-of-date due to advancements in the

occupation, technology, etc.

Clinical Review Memo. Undated. Apparently by Dr. David Monti, MD, Consulting Physician Lincoln Financial Group (451)

Based on the medical records reviewed the claimant's primary impairing diagnoses

include:

1) Right foot pain (M79.891)

2) CRPS type I of the lower limb (G90.52)

3) Chronic pain syndrome (G89.4)

4) Cervicalgia (M54.2)

5) History of right ankle fusion (Z98.1)

6) Left shoulder pain (M25.512)

7) Long term opiate use (Z79.671)

8) Left shoulder adhesive capsulitis (M75)

Taking into consideration the entire clinical picture, including evidence based medicine and any medication or other treatment side effects the claimant continues to have impairment of right foot pain as well as left shoulder pain. Due to these impairments the claimant would have the following restrictions limitations from the current time to 3/31/21 and ongoing:

1) No lift, push, pull greater than 10 pounds occasionally

2) Sit continuously with change of position every hour for five minutes

3) Stand and walk occasionally

4) Occasional bend, stoop

5) No reaching overhead on the left

6) No crouch, crawl, kneel

7) No limits on fingering, grasping and handling (452)

There is nothing in the medical record to suggest an inability to perform within these

restrictions and limitations for an eight hour day. The claimant has had ongoing pain in the right lower extremity related to CRPS. The claimant continues to be managed with the spinal cord stimulator and medications which have helped. There is nothing else to

do for this condition and thus these restrictions related to the right foot pain would be deemed

permanent. The claimant currently is still undergoing treatment for the left shoulder related to adhesive capsulitis. The restriction of reaching overhead on the left may resolve depending on the treatment, however, the other restrictions as outlined would be deemed

permanent. (452); There are no restrictions and limitations recommended by the treating provider for the time frames in question; The medical management recommended by the provider and followed by the claimant has been clinically reasonable and consistent with the apparent level of severity for the reported condition; There are no nonmedical circumstances identified in the medical record that may adversely impact work. (452)

I was able to speak with Austin Morrison, the nurse practitioner who works with Dr. McDougall. He noted the claimant was seen for her CRPS. She has had continued right foot pain and burning. (453) She recently underwent transposition of her spinal cord stimulator at the end of September. She recently returned for follow-up to have sutures removed and stimulator was noted to be in place. He noted that she was healing well and would be able to perform at a sedentary level. The restrictions and limitations would include:

1) No lift, push, pull greater than 10 pounds occasionally

2) Sit continuously with change of position every hour for five minutes

3) Stand and walk occasionally

4) Occasional bend, stoop

5) No crouch, crawl, kneel

6) No limits on fingering, grasping and handling

There is nothing in the medical record to suggest an inability to perform within these

restrictions and limitations for an eight hour day. These restrictions are agreed upon by her treating provider. The claimant has had ongoing pain in the right lower extremity related to CRPS. The claimant continues to be managed with the spinal cord stimulator and medications which had helped. There is nothing else to do for this condition and thus these restrictions related to the right foot pain would be deemed permanent. Beside this pain the claimant also has had increased left shoulder pain. The claimant has had MRI of the left shoulder revealing thickening of the glenohumeral ligament with. periligamentous edema. Her physical exam is also consistent with an adhesive capsulitis. The claimant has undergone a corticosteroid injection and is undergoing physical therapy. Beside the restrictions above, the claimant is also limited to no overhead reaching with the left arm.

Although the restrictions above would be permanent related to her CRPS, the claimant may be able to reach overhead with the left arm depending on her response to treatment for the adhesive capsulitis. The claimant's lifting restrictions however would remain the same.

Signed by David A. Monti, MD.

There is a handwritten "Activities Questionaire" responsive to Lincoln Financial Group filled out by the Plaintiff date 09/18/2023, a total of 8 pages by the claimant, in the claim file tendered to the Plaintiff which is in the file, oversized and inverted. (467-473) How long are you able to sit- 30 minutes With a change of position frequently, stand 5 minutes, walk 5 minutes, with brakes and no shoes caused by or due to pain.

How many hours a day do you sit : 30 minutes with change of position frequently stand 5 minutes walk 5 minutes with brakes and no shoes caused by or due to pain. Yes, I take one nap a day for 30 minutes to 1 hour what time of day. periodically caused by or due meds and sepsis fatigue

How many hours a day do you spend in bed - 15 hours 2° sepsis and pain and meds most comfortable position

Do you require any assistive devices such as a cane - yes cane, walker depending upon how I feel.

How long are you able to sit in a car - 30 minutes to 1 hour and adaptive equipment on seat and always changing position including reclining back.

Don't drive unless it's an absolute emergency caused by or due to pain meds and disability to RLE, (Right lower extremity)

How many times a day do you leave the house during the week? Only for doctor's appointments and therapy and family events

How often do you run errands? Never since I have been diagnosed with CRPS

Family and friends do errands

Signed by Kimberly Franks on 9/ 18 /23 (467)

Activities questionnaire page three of four. (469) Husband manages finances, balances checkbook. Bathing yourself - family assistance with balance and handrails due to or caused by pain and med, poor balance.

Going up and down stairs- myself with assistance from family and handrail due to pain and med poor balance

Have you been confined to a hospital within a last 12 months. yes. If yes please provide reasons neuro then placement septic. neurostain removed 922 neurostan placement 3/23 neurostain revision 9/ 29 St Luke's Medical Center in San Antonio.

Describe in your own words what prevents you from engaging in any gainful employment. - CRPS (complex regional pain syndrome) in traveling to other joints in my body made me unable to wear shoes due to or caused by pain to right foot. Neurostimulator helps with some pain but only 40% and unable to assist with toe pain and swelling. I am on hydrocodone two times a day which causes dizziness and fatigue to assist with pain. Due to pain rating up my, foot left leg from my body I fall a lot and I have poor balance and can't stand. sitting is hard to do to neurostatin battery and placement. lying down is only Relief period sepsis cause confusion and have to concentrate since I was in my spine and brain.

Please describe your daily routine: wake up daughter and husband help with morning ADLs Activities of daily living , due to or caused by poor balance and pain. They help me downstairs to recline. They cook breakfast, lunch and dinner for me the day they take the day. take naps in recliner or bed while watching tv. They assist me

upstairs to my bedroom. They assist with bathing and night activities of daily living caused by and due to poor balance and pain.

Go Outdoors periodically with family on weekends for about an hour. (470) Left hand dominant.

Are you able to work in your garden no are you able to work in your house no are you able to wash your car no. do you currently utilize the internet google. use Google for about 1 hour to research. do you currently View social media sites such as YouTube Facebook LinkedIn Etc no due to Vision being blurrred. how often do you engage in activities none do you use a desktop laptop or mobile phone Etc mobile phone if you're on a computer how long hours per day none if on phone how many hours per day 0 to 1 hours if on iPad how many hours a day none if on e-reader how many hours a day none for what reasons you use these devices text message or email. how many hours a day do you play video games none

How are the following accomplished grocery shopping family/friends Caring groceries into the house Family Friends Cooking meals family and friends Cleaning after meals family and friends Cleaning bathrooms family and friends Vacuuming family and friends Doing the laundry family and friends Opening and responding to mail family and myself.

Claimant supplementary statement Do you hold a professional license yes in case I get better. Income - no social security no wages no short-term disability possession or retirement benefits no workers comp no severance or employment

separation other income none employment. Dated 9/18/23.. Documents were apparently faxed on 09/25/2023. (472) (494- 502)

None of the claimants were apparently considered by Lincoln, including in the. August 8, 2024 final denial letter. None were forwarded to Linicolns experts. None were judged for credibility with medical records. None were evaluated by medical professionals for credibility. None were compared to other statements and records, including the claimant themselves for consistency. The Plaintiff could not find that these records were submitted to any medical provider to determine their accuracy or evidence of malingering.

The Plaintiff filled out these forms in good faith, at the request of Lincoln Financial Group, A.K.A. the Lincoln National Life Insurance Company Disability and Life Claims in a letter request dated August 18, 2023. (506) Therefore, it is implied that her answers to the questionnaires would be used in determining her disability beyond 24 months. The Plaintiff found that the Plaintiffs statements were not used in her determinations, used to decide the claim, nor were they forwarded to Physicians to determine if her statements were credible, or inconsistent with the objective medical records of MRI's etc. The Plaintiff asserts that if her statements are not utilized or are ignored as to the reasons she is disabled she is being denied a full and fair review under ERISA § 503 and 29 U.S.C. § 1133(2)

---

UT Health San Antonio record 1/23/2023 49-year-old female who approximately 4 months ago presented to the emergency room with an infected recently implanted

thoracic SCS system from another surgeon evidence of infection was clear-based upon gross examination with purulent drainage from the surgical sites and so system was explanted and sites washed out microbiology was ultimately positive for MRSA and she was treated for 14 days forecast course of linozoid per ID service recommendation she now presents for consideration of system reimplantation

UT Health San Antonio progress notes by Ian McDougall MD at 9/7/2023 50-year-old female here for follow-up for my position of right flank thoracic SCS generator on exam the generator has migrated to more inferior location now in her gluteal range where before it was in her right flank. the patient on Gross examination has clearly lost weight since her system implant and on discussion with her she has lost approximately 40 pounds which is the reason for the inferior migration of the generator site into her gluteal region discussed with her the risks and benefits of repeat surgery to revise a generator site position and she would like to proceed as a current location causes her discomfort Where She Bangs it more often and sits on it likely time for surgery will be September 29th 2023 for generator pocket site revision without generator exchange pending appropriate pre-ops labs and insurance approval.

---

The Plaintiff received an August 8, 2024 letter stating: "We reviewed Mrs. Frakes's appeal request for Long Term Disability ("LTD") benefits and maintain the decision to deny benefits beyond March 7, 2024."

<u>Initial Claim Decision</u> Mrs. Frakes submitted a claim for her absence from work as of September 7, 2021 as a result of right ankle reconstruction. A change in definition of

disability occurred on March 7, 2024 to receive benefits beyond 24 months, Mrs. Frakes must be disabled from any occupation as defined in the Policy. benefits beyond March 7, 2024 were denied as the evaluation concluded she was no longer disabled as defined by the Policy.

The basis for the decision was outlined in a letter dated October 25, 2023. Mrs. Frakes was provided an opportunity to request an appeal review of the denial, stating the reasons why she felt that her claim should not have been denied, and submit additional information to support her claim.

Specifically, she was advised to submit the following information: All documentation from Dr. McDougal, and or any of your other treating providers that would show evidence that you do meet the definition of disabled continuously from Any Occupation beyond March 7, 2024 such as: test results with positive findings, such as an MRI or CT Scan, or, office visit notes that document physical exam findings, hospitalization records, lists of prescription medications with their start date/dosages, a detailed treatment plan which would outline a description of your specific restrictions and limitations, and any physical or occupational therapy records. A full copy of your Social Security Administration (SSA) disability benefit claim file including any IMEs that may have been performed on behalf of the SSA.

**Appeal**

In Mrs. Frakes's letter of appeal dated February 20, 2024, she indicated secondary to the severe pain, the battery placement was and still is causing rubbing on her ribs and hips with sitting and movement.

In support of Mrs. Frakes' claim, she submitted the following information: Progress notes and test results from date of service July 10, 2023 through January 29, 2024.

Appeal Evaluation Mrs. Frakes's claim was originally reviewed by independent physicians who were board certified in Physical Medicine and Rehabilitation and Pain Medicine. Please see the letter dated October 25, 2023 from Lincoln Financial Group for the findings of the review. Benefits were denied as the evaluation concluded Mrs. Frakes did not meet the definition of disability under SavaSeniorCare's Policy.

During the review of Mrs. Frakes's appeal, her claim was reviewed by our clinical service department. Based on their review of the medical records, they concluded:

In summary, the employee initially separated from the workplace in September 2021, due to the development of complex regional pain syndrome in her right foot after surgery performed in April 2021. The employee had tried physical therapy and neuropathic pain medications without relief. She underwent lumbar sympathetic blocks and eventually underwent a spinal cord stimulator placement. Pain was managed with this and hydrocodone. In June 2023, the employee had ongoing left shoulder pain and loss of function. She was diagnosed with shoulder impingement and referred for course of physical therapy in August 2023. There was minimal improvement in the shoulder, and she eventually underwent manipulation under anesthesia of the left shoulder in January 2024. The employee also required repositioning of the spinal cord stimulator generator that had moved from the initial placement. She is pending a rheumatology evaluation as of February 2024. A

functional capacity evaluation was performed on February 15, 2024, from which NP Cain had indicated her conditions significantly impacts her ability to perform voluntary and functional activities.

Based on the available medical evidence, it is unclear if the restrictions as outlined in the functional capacity evaluation are reasonable and supported. Therefore, to evaluate the employees physical condition and any restrictions and limitations ongoing, recommend a full file review with physical medicine and rehab.

Mrs. Frakes's claim was reviewed by Dr. Kum-Nji, an independent physician who is board certified in Physical Medicine & Rehabilitation. Based on Dr. Kum-Nji's review of the medical records, he concluded:

Primary impairing Diagnosis(es)

- Right foot/ankle pain (M25.571)
- Right arch fibroma removal on 4/21/21
- Sip right ankle fusion
- Complex regional pain syndrome of right lower limb (C90.521)
- Sip SCS implant in 9/2022 with removal due to an infection present. and ongoing, with re-assessment on or around 9/8/2024Sip second SCS implant in 3/2023
- Low back pain (M54.5)
- Lumbar degenerative disc disease (M51.36)
- Left shoulder pain

- Adhesive capsulitis of left shoulder (M75.02)
- Sip left shoulder manipulation under anesthesia on 1/10/24

The claimant is a 50-year-old female with a medical history significant for right foot/ankle pain, right arch fibroma removal on 4121121, sip right ankle fusion, complex regional pain syndrome of right lower limb, sip SCS implant in 9/2022 with removal due to an infection, sip second SCS implant in 3/2023, low back pain, lumbar degenerative disc disease, left shoulder pain, adhesive capsulitis of left shoulder, sip left shoulder manipulation under anesthesia on 01/10/24.

Based on the information provided, the claimant has been experiencing right foot/ankle pain with chronic regional pain syndrome (CRPS), sip right ankle fusion, and multiple surgeries including SCS implantation for pain management. She also suffers from low back pain due to lumbar degenerative disc disease and left shoulder pain from adhesive capsulitis, and she underwent left shoulder manipulation under anesthesia, arthrocentesis, aspiration and/or injection on 1/10/24.

Despite interventions such as surgery and injections, the claimant continues to experience significant pain and functional limitations, exacerbated by falls and infections. Functional assessment dated 2/15/24 indicates she is only able to tolerate light-duty work with accommodations, such as avoiding prolonged sitting, standing, walking, and lifting. Therefore, the claimant requires restrictions and limitations as outlined below:

*Sitting:*

*Unrestricted*

*Standing:*

*Occasionally*

*Walking:*

*Occasionally*

*Lifting: Occasionally up to 10 lbs.*

*BUE Carrying: Occasionally up to 10*

*lbs. BUE Pushing: Occasionally up*

*to 10 lbs. BUE Pulling: Occasionally*

*up to 10 lbs. BUE Climbing stairs:*

*Occasionally*

*Balancing:*

*Occasionally Stooping:*

*Occasionally Kneeling:*

*Occasionally*

*Crouching:*

*Occasionally Crawling:*

*Never*

*Reaching: Occasionally, overhead and below waist levels BUE;*

*Unrestricted, to desk level BUE*

*Using lower extremities for foot controls: Occasionally RLE;*

*Unrestricted UE Fine manipulation: Unrestricted BUE*

*Simple and fine grasping:*

*Unrestricted BUE No climbing*

*ladders*

*No working at unprotected*

*heights No operating heavy*

*machinery*

*The above recommended restrictions and limitations are indicated from 03/08/2024 to* - Dr. Kum-Nji indicated there were no available medical records indicating any restrictions and limitations recommended by her treating providers for the timeframes in question.

Unsuccessful attempts were made to contact Dr. McDougall and Dr. Williams on March 20, 2024 and March 21, 2024.

Additionally, her file was referred to a Vocational Specialist to conduct a vocational analysis based on the restrictions and limitations set forth by Dr. Kum-Nji for the period March 8, 2024 forward and her current capabilities, training, education, and experience.

Based on this information Ms. Frakes's would have the ability to perform the following occupation(s):

<u>Occupation National Economy</u>          <u>Monthly Wage</u>

*Hospital - Admitting Clerk*

*$3,226.00 Customer Service*

*Representative*

*$3,148.00 Information Clerk*

*$2,831.00 Receptionist $2,831.00*

*Appointment Clerk*

*$2,831.00*

On April 9, 2024, we sent Mrs. Frakes a letter which included a copy of the medical and vocational reviews performed in connection with her request for reconsideration. She was given an opportunity to review and respond with any additional information she would like considered before a final determination was made on her appeal. We asked she provide her response by April 30, 2024.

On April 30, 2024, we received a Jetter from Mrs. Frakes and office visit notes from Dr. Chiang and Lonestar Urgent care dated April 15, 2024 through April 25, 2024. The information was submitted for an addendum review by Dr. Kum-Nji.

Dr.. Kum-Nji concluded:

The additional information does not alter my previous opinion. On 4/15/24, the claimant presented with all over joint pain. She reports she has to sit leaning entirely to the left due to current position of neurostimulator, however, she has complications with previous 2 modulators as well.

She reports she cannot stand/ambulate and currently limping due to excruciating pain to her right big toe, which is causation of back pain due to her gait. On exam, she has limping gait and leaning to the left; deep tendon reflexes are intact and symmetrical;

sensation is intact to touch. In a letter dated 4/22/24, the claimant noted that she has suffered from numerous complications, and she was still having complications at this present time. She was suffering chronic pain to her left rib and hip region while sitting and standing, secondary to the battery placement of her neurostimulator. She was continuing to fight get her pain under control by seen by multiple medical professionals. She is not currently physically or mentally able to return to any type of work duties employment. X-ray of the lumbar spine from 4/25/24 revealed spinal cord stimulator that overlies and may abut the tip of the right 12th rib, the tip of one of the wires lies at approximately the level of the T12 vertebral body, with the other cranial to this; preserved vertebral body height and alignment; mild multilevel disc height loss which is most prominent at L3-4 and L4-5 with mild spurring at these levels; mild to moderate facet sclerosis at L4-5 and L5-S1 bilaterally.

Based on the additional information, the claimant has continued to experience chronic pain functional limitations. Therefore, previously listed restrictions continue to apply. The claimant has chronic conditions with ongoing symptoms and is functionally limited. On May 7, 2024, we provided a copy of the addendum to Mrs. Frakes for her review and response. We asked that she provide her response no later than May 27, 2024.

On May 23, 2024, we received a letter from your office advising of your representation of Mrs. Frakes. You requested a copy of Mrs. Frakes claim file and a 10-day extension to submit additional evidence through June 6, 2024

On May 23, 2024, we provided a copy of the claim file and granted an extension through June 6, 2024 to provide additional evidence. (The Plaintiff never received the requested summary plan)

On May 30, 2024, in order to take into consideration Mrs. Frakes reports of the inability to sit for any period of time, we requested a review from Dr. Kum-Nji. We asked for clarification to specifically address restrictions and limitations with sitting, due to the documented reports of pain. On June 5, 2024, a clarification review was completed by Dr. Kum-Nji. (This review was requested after their previous decision).

Dr. Kum-Nji concluded:

There are additional restrictions and limitations related to sitting, as the claimant responds she has to sit leaning entirely to the left due to current position of neurostimulator, and she also responded in her letter that she was suffering from chronic pain to her left rib and hip region while sitting secondary to the battery placement of her neurostimulator. Therefore, the following sitting restrictions apply: Sitting: Constantly, 1 hour at a time, with a 5-minute position changing break every hour. The 5-minute break is considered a "stand and stretch" break during sitting due to pain. This is not necessarily a break from work but is intended to provide the claimant with the ability to relieve pressure and reduce pain. The claimant may still work during this break but would be in a standing position.

The above recommended restrictions and limitations are indicated from 03/08/2024

to - present and ongoing, with re-assessment on or around 9/8/2024.

On June 6, 2024, we provided a copy of the addendum to you for your review and response. We asked that you provide your response no later than June 26, 2024.

On June 25, 2024, we received a voicemail from your office stating you did not receive the June 6, 2024 letter from us.

On June 25, 2024, we resent a copy of the addendum review and asked that you provide a response no later than July 4, 2024.

In response to your June 25, 2024 voicemail, we resent a copy of the June 6, 2024 and June 25, 2024 letters to you and sent another letter dated June 25, 2024 with the previous reviews attached. We asked that you provide your response no later than July 4, 2024. We received a letter from you dated July 3, 2024, setting forth your objections to our June 6, 2024 and June 25, 2024 letters along, our procedures and requesting we immediately begin Ms. Frakes long term disability payments.

As the updated restrictions and limitations were more restrictive to sitting, we requested an updated vocational analysis. The analysis was completed on July 9, 2024 and indicated the occupation of Order Control Clerk, Blood Bank was eliminated due to the reaching requirements. All previously identified occupations remain viable. The Voc analysis indicated, *In the current employment environment, and as a result of technological advancement, employers are providing a variety of workstation types and associated equipment that would allow an individual*

*opportunity to experience and sustain comfort in their respective work settings within the occupations above.*

(The retroactive vocational analysis, denies the Plaintiff the right to an appeal. There is nothing in the plan that provides that a policyholder can be considered to perform other jobs with "workstation and associated equipment" as practically under such vague specifications, no one could be considered disabled; moreover, this is an admission that the plaintiff could not perform these jobs without a variety of workstation types and associated equipment; and such workstation types and associated equipment are not specified. Therefore, the vocational analysis has not provided any occupations for the Plaintiff to perform.)

On July 10, 2024, we provided a copy of the vocational analysis addendum to you via fax, email, and mail for your review and response. We asked that you provide your response no later than July 30, 2024.

In response on July 12, 2024, we received a letter from you confirming you received our July 10, 2024 letter with the vocational analysis addendum and statements regarding *your* disagreement with our appeal review.

While we have taken this information into consideration, it is important to note we only received pain management office visit notes through August 1, 2023 from Dr. Robert S. Williams. You did not submit-any office visit notes from neurology surgery after that date. There is no indication Mrs. Frakes has been referred for a surgical consultation to correct the placement of the neurostimulator. You mentioned mental nervousness, but no mental health information or mental status evaluations have

been submitted for our review. We are unable to evaluate any impairment due to a mental health condition without treatment records and/or evidence of impairment.

You did not submit any office treatment notes from primary care, pain management, or neurology with complete physical status exams, diagnostic testing or imaging, and treatment frequency dating back to March 7, 2024.

In addition, we requested the clarification in order to assure you we took into consideration your concern regarding any restrictions or limitations in regard to sitting. The clarification took into consideration the reports of pain and difficulty with sitting for prolonged periods of time.

It is important to clarify the existence of a medical condition/diagnosis in and of itself does not equate to eligibility for disability benefits. The focus of our assessment was not whether or not a condition exists; but rather whether or not impairment exists that would preclude her from performing the duties of her own occupation.

Based on our review, which included an independent physician review we conclude the information is insufficient to support evidence of continued impairment.

We are aware that Mrs. Frakes's claim for Social Security Disability Income benefits is being processed. It should be noted that any ruling by the Social Security Administration does not determine entitlement to benefits under the terms and conditions of the SavaSeniorCare's Group Disability Income Policy.

<u>Conclusion</u> We conducted a thorough and independent review of Mrs. Frakes's entire claim. In summary, we acknowledge that she may have continued to experience some

symptoms associated with her condition beyond March 7, 2024. However, the information does not contain physical exam findings, diagnostic test results or other forms of medical documentation supporting her impairments and symptoms remained of such severity, frequency, and duration that they resulted in restrictions or limitations rendering her unable to perform the duties of her occupation after that date.

This claim decision reflects an evaluation of the claim facts and Policy provisions.

Policy Provisions

In order to continue receiving benefits, Mrs. Frakes must satisfy the requirements of all Policy provisions that state, in part:

Proof Satisfactory Proof of loss must be given to Lincoln no later than 90 days after the end of the Elimination Period.

Failure to furnish such Proof within such time shall not invalidate or reduce any claim if it was not reasonably possible to furnish such Proof within such time.

Such Proof must.be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time Proof is otherwise required.

Proof of continued loss, continued Disability or Partial Disability, when applicable, and Regular Attendance of a Physician must be given to Lincoln within 30 days of the request for such Proof

Lincoln reserves the right to detennine if the Covered Person's Proof of loss is

satisfactory. Disability" or "Disabled" means:

1. For persons other than pilots, co-pilots, and crewmembers of an aircraft: during the Elimination Period and until the Covered Person reaches the end of the Maximum Benefit Period, as a result of an Injury or Sickness, he is unable to perform the Material and Substantial Duties of his Own Occupation.

2. With respect to Covered Persons employed as pilots, co-pilots and crewmembers of an aircraft:

"Disability" or "Disabled" means as a result of Injury or Sickness the Covered Person is unable to perform the Material and Substantial Duties of Any Occupation

"Own Occupation" means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as *it* is normally performed in the national economy. (FOrm ADOP-DEF-7

Disability Benefit

When Lincoln receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Lincoln will pay the Covered Person a Weekly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Lincoln Proof of continued:

1. Disability;

2. Regular Attendance of a Physician; and

3. Appropriate Available Treatment.

The Proof must be given upon Lincoln's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, Lincoln will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

"Appropriate Available Treatment" means care or services which are:

1. generally acknowledged by Physicians to cure, correct, limit, treat or manage the disabling condition;

2. accessible within the Covered Person's geographical region;

3. provided by a Physician who is licensed and qualified in a discipline suitable to treat the disabling Injury or Sickness;

4. in accordance with generally accepted medical standards of practice.

"Material and Substantial Duties" means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

(The Plaintiff - The Defendants did not define “responsibilities” in the Group Disability Income Policy whcih they define as a “contract.” The Defendants appear to imply that “responsibilities” are somehow involved in the physical requirements to perform

work. Responsibilities implies the ability to be at work on time, assume the mental responsibilities of performing work, etc. The Defendants do not name the responsibilities of any of the occupations which they state the claimant could perform, they only list the physical requirements of each job as “sedentary”, “medium”. etc.

Discontinuation of the Long Term Disability Benefit

The Monthly Benefit will cease on the earliest of'

*1. the date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;*

*2. the date the Covered Person fails to cooperate in the administration of the claim. Such cooperation includes, but is not limited to, providing any infonnation or documents needed to determine whether benefits are payable or the actual benefit amount due.*

*3. the date the Covered Person refuses to be examined or evaluated at reasonable intervals;*

*4.the date the Covered Person refuses to receive Appropriate Available Treatment;*

*5.. the date the Covered Person is no longer Disabled according to this policy;*

I

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, Mrs. Frakes was entitled to appeal the decision made by Lincoln Financial Group, and to submit any additional information she wished to be considered as part of the appeal. Lincoln Financial Group has conducted a full and fair review of her appeal and accompanying materials, and has concluded that the denial of benefits will be maintained.

At this time, Mrs. Frakes's administrative right to review has been exhausted; no further review will be conducted: *Legal Proceedings*

*A claimant or the claimant's authorized representative cannot start any legal action:*

*1. until 60 days after Proof of claim has been given; or*

*2. more than one year after the time Proof of claim is required.*

The date on which the_contractual limitations period expires for this c;Iaim.is August 8, 2025.

Decisions made by Lincoln Financial Group are based on the provisions outlined in

SavaSeniorCare's Policy. These provisions are not contingent on decisions made by either the Social Security Administration or other disability-determining entities.

Nakeshia Killian

---

The Defendant states in their August 8, 2024 letter the following regarding Disability*:* "Disability" or "Disabled" means as a result of Injury or Sickness the Covered Person is unable to perform the material Material and Substantial Duties of any Occupation. (ADOP-DEF-3) (p. 11.)

However ,the defendant is using the wrong standard, herein. The standard the defendant is supposed to be suing is, whether the "Covered person is unable to perform with reasonable continuity, the Material and Substantial Duties of Any Occupation." The standard the Defendant keeps referencing is persons employed as pilots, co-pilots and crewmembers of an aircraft. See Form ADOP-DEF-3. The Plaintiff is not a pilot or co-pilot or crew member of an aircraft, the Plaintiff was an occupational therapist, and there is an additional caveat, that is with "reasonable continuity."

(The Plaintiff points out that Reasonable Continuity is not defined in the policy. The Plaintiff would assert that reasonable continuity means that the Insured would have the ability to work reasonably, all day with minimal breaks, and without missing more than 2 days per month. The reasonable continuity standard was not posed to the vocational experts and they did not opine on whether or not the Plaintiff with reasonable continuity. )

Reasonable continuity in the 1st Circuit found that a claimant need not be totally incapacitated if the claimant cannot perform their job with reasonable continuity they may be considered disabled. McDonough v. Aetna Life Ins. Co., 783 F.3d 374 (1st cir. 2015); IN Demiirovic v. Building Service 32 B-J Pension Fund, 467 F.3d 208 (2d Cir. 2006) states that occasional or sporadic work ability doesn't mean the claimant can maintain employment. in Motions v. UNUM Life Ins. Co. of America, 2013 WL 149961 (E.D. Mich January 14, 2013) the court emphasized that inability to maintain reasonable

continuity in performing work duties qualified her as disabled under the ERISA plan. In Wales v. Metlife, 49 F. Supp 2d 1151 (D. Kna. 2007) the court held that the inability to sustain performance of occupational duties with reasonable continuity was enough for disability. In Saffle v. Sierra Pac. Power Co. 85 F.3d the ninth circuit held that a plan administrator must evaluate whether the claimant can perform their occupation with regularity and consistency, not just occasionally. 85 F.3d 455 (9th Cir. 1996)

The Defendants states it defines "Material and Substantial Duties" means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." The Defendant does not state what are the “responsibilities” of the occupations; The Defendant does not define what they mean by “responsibilities”; The Defendant does not state or clarify which “responsibilities” cannot be reasonably eliminated or modified. Specifically, are these physical responsibilities? Job responsibilities? How are “responsibilities” connected to the ability to physically perform work? The denial constitutes no denial at all because it is not specific as to what the "responsibilities" are and whether or not the Plaintiff could perform such responsibilities.

Assuming that the Defendant is asserting these are “i “ that can be reasonably eliminated or modified, there is no indication that is what responsibility means in this context. Employee responsibilities are not discussed, as job duties, workplace rules, loyalty and confidentiality, or to report discrimination. Responsibility means generally the state of being answerable for an obligation, and includes judgment, skill, ability,and capacity. Black’s Law DIctionary (5th Ed. 1979)

The Voc analysis stated, In the current employment environment, and as a result of technological advancement, employers are providing a variety of workstation types and associated equipment that would allow an individual opportunity to experience and sustain comfort in their respective work settings within the occupations above. The V.E. and the decision is inferring that the

claimant could perform the occupations through a variety of workstation types and associated equipment that would allow the claimant to sustain comfort. First of all, the Defendant does not state what are those workstation types and associated

equipment that would allow the Plaintiff to perform work in the work settings; second, the policy does not that these considerations should be made or could be made in determining whether or not a policy holder and claimant could perform other occupations.

Assuming that the Defendant is asserting these are "responsibilities' that can be reasonably eliminated or modified, there is no indication that is what responsibilities means in this context. Employee responsibilities are not discussed, as job duties, workplace rules, loyalty and confidentiality , or to report discrimination.

The Policy states a claimant is disabled for long term disability if he or she is unable to perform with reasonable continuity the Material and Substantial Duties of any occupation. ADOP-DEF-3. ' Material and Substantial Duties" is defined for Long Term Disability" to mean" responsibilities that are normally required to perform the covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified. (ADOP-DEF-6).

The Policy states that this policy is a legal contract. (FORM DOP .5) The denial does not state what are the responsibilities for the other occupations listed. The listed occupations only list the physical requirements of the jobs they list. Responsibilities that are normally required to perform the listed occupations are not discussed.

That Disability Definition states that Disability is the inability to perform the material and substantial duties of any occupation. However, the actual standard is contained apparently in class 2, 3, 0r 4, the standard is for the covered person to be unable to perform , with reasonable continuity, the material and substantial duties of any occupation. Form ADOP-DEF-3. According to Lincoln's

"Transferrable Skills Analysis" dated 10/18/2023 by Nicole Hall the Plaintiff Frakes was an Occupational therapy Assistant. Therefore, the wrong standard was used. This "Transferrable Skills" analysis listed six jobs which were

used, as "reasonable continuity" was not considered. "Examples of Occupations Identified based on National labor market and the insured's ability profile analysis:

Hospital - admitting clerk DOT Code 205.362-018 Sedentary,

Customer Service Representative DOT Code 239.362-014 Sedentary,

Information clerk DOT Code 237.367-022 Sedentary,

Receptionist - DOT Code 237.367-038 Sedentary,

Appointment Clerk - DOT Code 245.362-026 Sedentary,

Obviously the "responsibilities" for each occupation would be substantially different.

These were the six jobs listed in the August 8, 2024 letter from Lincoln.

Consultants in Pain Medicine, PA. Signed by Mattheew B. Hoch DO on 08/03/2023 PA Chief complaint patient Kimberly Frakes 50 year old female. (527-531)

Imaging History:

MRI L-MRI 1-2022, L1-2 - no bulge/herniation

L2-3 - 2mm herniation impinges thecal sac with no NFN L3-4 - 2mm herniation impinges thecal sac with no NFN

L4-5 - 2mm herniation impinges thecal sac without narrowing

L5-S1 - 2.5mm herniation impinges S1 nerve root bilaterally, mild narrowing of the medial aspect of

the NF

T-MRI 7-25-2022 -mild degenerative disease of the thoracic spine with mild spondylosis-no disc herniation, canal nor NF stenosis

Shoulder- MRI, left shoulder 7/2512023- Thickening of the inferior glenohumeral ligament, with periligamentous edema. Correlate with clinical signs of adhesive capsulitis. Mild supraspinatus and infraspinatus tendinosis.

Primary complaint of shoulder pain in the secondary complaint of foot pain

CPM consultants in pain medicine, PA visit date 6/8/2023 rendering provider is Matthew b h o c h d o. Presents with primary complaint of low back pain and a secondary complaint of foot pain

Assessment:

1. G89.4-338.4 Chronic pain syndrome 2. M54.2-723.1 Cervicalgia 3. M25.512-719.41 Left shoulder pain 4. Z79.891-V58.69 Long term (current) use of opiate analgesic 5. Z79.899-V07.39 Other long term (current) drug therapy 6. G90.529-337.22 CRPS 1 (complex regional pain syndrome I) of lower limb 7. M79.671-729.5 Right foot pain 8. M79.674-729.5 Toe pain, right 9. Z98.1-V45.4 H/O ankle fusion 10. Z68.31-VB5.31 Body mass index (BMI) 31.0-31.9, adult (P. 535)

CPM consultants in pain medicine then, PA visiting 8/4/22. Patient is present for a follow up visit post SCS Trial. Patient states swelling to her foot has reduced and been able to stand longer and going up and down stairs is less painful. She states numbness has decreases as well. Patient is able to perform most ADL's but does so with pain. (536)

CPM Consultants in Pain Medicine, PA, Visit Date: 07/28/2022 She presented with low back pain. Today's pain level: 8/10. PROCEDURE: PERCUTANEOUS IMPLANTATION OF EPIDURAL SPINAL

STIMULATOR LEAD(S) FOR SPINAL CORD TRIALElectronically signed by: Matthew B Hoch DO on 07/28/202 Consultants Pain Medicine, PAConsultants in Pain Medicine, PAVisit Date: 06/22/2022

Assessment: 1. M79.674-729.5 Toe pain, right 2. M79.671-729.5 Right foot pain 3. 890.529-337.22 CRPS 1 (complex regional pain syndrome I) of lower limb 4. Z98.1-V45.4 H/O ankle fusion 5. Z68.30-V85.30 Body mass index (BMI) 30.0-30.9, adult

Interventional Therapies; An initial SGS trial will be Scheduled. The patient is a candidate for spinal cord stimulation (SCS) I neuromodulation for treatment of severe, refractory, and debilitating pain due to complex regional pain syndrome that is refractory to conservative management. The goal of therapy includes improvements in pain, function, and quality of life and/or a decreased dependence upon oral pain medications.

- Per ASRA guidelines for anticoagulants, hold motrin x24hours, excedrin migraine (aspirin) x5 days.

- The patient requested intravenous sedation due to a phobia/fear of needles, and procedural anxiety [F40.231). This was supported by a review of patient history and today's examination.

Intravenous

Electronically signed by: Matthew B Hoch DO on 06/22/2022

Visit Date: 04/27/2022Visit Date: 04/27/2022:',.tisit Date: 03/10/2022!Visit Date: 02/23/202Assessment:

1. G90.529-337.22 CRPS 1 (complex regional pain syndrome I) of lower limb 2. M79.671-729.5 Right foot pain 3. Z68.30-V85.30 Body mass index (BMI) 30.0-30.9, adult

PROCEDURE: Lumbar Sympathetic Block

Visit Date: 02/08/2022

---

The Long Term Disability Policy stated there is a "rehabilitation" section. (ADOP-LTD-8). The Plaintiff was not offered an opportunity to accept or decline the “Rehabilitation Program” The Defendant made a determination that the Plaintiff would not benefit from a rehabilitation Program, and therefore that she could be adequately rehabilitated to perform an occupation. “Rehabilitation Program” means a comprehensive individually tailored, goal oriented program to return a Disabled Covered Person to gainful employment.” (ADOP-LTD-9)

The Plaintiff asserts the Defendant demonstrated a lack of thoroughness and accuracy of the determination of benefits since all of the medical evidence was not used.

The Defendant failed to consider objective medical evidence, including her own statements as to her physical limitations.

The Defendant’s experts were not qualified as experts in accordance Daubert v. Merrell Dow.

The Defendant failed to follow the terms of the plan or policy.

The Plaintiff states that she was not financially protected as she was told that the policy is a “contract” and was not told when she paid for the policy that the Defendants were subject to an abuse of discretion standard in deciding her claim.

The Plaintiff asserts that under a de novo standard or under an abuse of discretion standard the Defendants abused their discretion and/or misconstrued or misapplied the Policy in one, or more of the following ways: 1) The legal standard of “reasonable continuity” was not used in deciding the occupations the Plaintiff could perform. 2) The Defendants basically added a provision on the Group Disability Income Policy that changed the definition of Material and Substantial Duties of any occupation to to a definition that stated that included: “technological advancement, employers are

providing a variety of workstation types and associated equipment that would allow an individual opportunity to experience and sustain comfort in their respective work settings within the occupations above." 3) The Defendants misapplied or misconstrued the word "responsibilities" as physical requirements, as found under "Material and Substantial Duties" and does not discuss whether the Plaintiff could perform the responsibilities of the occupations they state the claimant could perform; nor do they or their vocational experts list the responsibilities for the alleged occupations that the Plaintiff could perform. 4) The Objective medical record, in particular the MRI's, along with the Plaintiff's physical limitations would find the Plaintiff disabled under any standard. 5) The Defendants required the Plaintiff to apply for Social Security Disability, required that she tender documents to her regarding her disability claim, referred her to their partner for the disability claim, will benefit from the set-off in paying benefits if she wins, and then states they will not consider a Federal Judge's decision finding her disabled under practically identical standards to the Disability Income Policy. 6) The Plaintiff was designated not to be eligible for a program to return her to gainful employment.

## CLAIM FOR RELIEF

The Plaintiff prays for one, or more, of the following:

1) Payment for past due long term disability benefits under the Group Disability Income Policy

2) An award of long term disability under the Group Disability Income Policy.

3) General damages for breach of fiduciary duty and misrepresentation under ERISA

4) For such other an equitable relief to redress violations of ERISA pursuant to 29 U.S.C. § 1132(a)(3)

5) Attorneys fees; ERISA § 502(g)(1) provides a court with discretion to allow a reasonable attorney's fee and costs of action to either party.

6) Costs of Court;

7) All other relief the court deems proper and just.

Respectfully submitted,

By: /s/ Mark A. Di Carlo
Mark A. Di Carlo, PLLC
Attorney at Law

La Solana Building
722 Elizabeth Street
Corpus Christi, Texas 78404
markdicarlo722@gmail.com
(361) 888-6968
FAX (361) 887-6410
SBN: 05812510
FBN: 6839

ATTORNEY FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above-entitled and numbered complaint has been electronically filed on the 8th day of August 2025 to the following:

United States District Clerk
U.S. Courthouse
Via Pacer

Respectfully submitted,

By: */s/ Mark A. Di Carlo*

Mark A. Di Carlo, PLLC
Mark A. Di Carlo
Attorney at Law
La Solana Building
722 Elizabeth St.
Corpus Christi, TX 78404
(361) 888-6968
markdicarlo722@gmail.com
FAX (361) 887-6410
SBN: 05812510
FBN: 6839

ATTORNEY FOR PLAINTIFF